**550**

WESTERN LAND CORPORATION, a
Delaware corporation,
Plaintiff,

v.

CRAWFORD–MERZ COMPANY et al.,
Defendants.

No. 4–71–Civil 615.

United States District Court,
D. Minnesota,
Fourth Division.

Nov. 6, 1973.

---

Walter R. Nelson, Nelson & Cheney, St. Paul, Minn., for plaintiff.

Richard L. Dahlen, Johnson, Thompson, Klaverkamp & James, Minneapolis, Minn., for Crawford-Merz.

Fred R. Jacobberger, Henretta, Friedell, Share, McGinty & Solomon, Minneapolis, Minn., for Thorsen & Thorshov, Inc.

Jerry G. Dygert, Dygert & Dygert, Minneapolis, Minn., for Gisselbeck, Fox, DeJager, Estate of Hays, Dahl, and Sioux Falls Holding Co.

George J. Game, pro se.

## MEMORANDUM DECISION

LARSON, District Judge.

### I. *Facts*

This action arises out of the sale of a proposed shopping center in Sioux Falls, South Dakota. Western Land Corp. (Western), in a transaction closed in December of 1967, sold to the Crawford-Merz Company (C-M) and Willard L. Thorsen, Thorsen & Thorshov, Inc. (T & T), the plans, specifications, contracts for services of the general contractor C-M and architect T & T, options to lease land, commitments for interim and permanent financing, and leases with a number of prospective tenants. The sales agreement whereby the sale was effected was transmitted to Western by C-M and T & T on November 7, 1967, accepted by Forrest Miller, Western's Vice President and Treasurer, and approved in a special meeting by Western's board of directors on November 10, 1967. The consideration recited in that agreement consisted of $294,000 payable in the amount of $30,000 at closing and the balance in 24 monthly installments of $12,000 each without interest; termination of the architect's and contractor's contracts and any claims having previously arisen thereunder; return of $40,000 deposited with the permanent lender; and a management agreement whereby Western was to receive three per cent of the gross rents generated by the completed center.

Western Land was chartered by the State of Delaware in 1960 and the articles of incorporation gave it broad powers to deal in the purchase and sale of real estate. Initially, however, its operation appeared to be limited to constructing, acquiring sites for, developing, and operating shopping centers. Prior to the sale of the Sioux Falls project, Western had built and operated various shopping centers and retail stores. Prior to 1967, Western had divested itself of an unbuilt shopping center in Austin, Minnesota, entered a sale and leaseback of the land under the completed center in Faribault, Minnesota; and had sold a completed center in Winona, Minnesota, with a leaseback and repurchase option. In 1967 Western sold a center near Chicago, sold its half-interest in seven free standing Montgomery Ward stores, and sold the center in Faribault and the Sioux Falls center.

The concept of the Sioux Falls center originated in 1964 and an option for a ground lease was obtained in 1965. In the fall of 1966 Ellsworth Johnson, Executive Vice President of Western Land, approached C-M and T & T regarding the investment possibilities of the proposed project. Nothing came of the initial discussions. A permanent mortgage commitment for the project was obtained in June 1967, in the amount of $3.9 million. Construction of the center did not commence in June, however, because the interim lender which was to distribute the construction funds would not do so until $300,000 was deposited with it in cash. At that point Western sought potential lenders for that amount. In July of 1967, C-M and T & T proposed to Western a purchase of the Sioux Falls Center for $450,000 with an option for Western to repurchase. This offer was not accepted but negotiations continued. In addition to C-M and T & T's offer, certain other potential investors made offers that were not accepted. During that same period a group of investors was assembled by Robert Gisselbeck who had been asked by Western to find persons willing to provide the money to Western. C-M and T & T, who received no responses to an offer made on October 10, 1967, offering Western $300,000 and forgiveness of the amounts due them, agreed to enter the Gisselbeck group financing arrangement. That arrangement was to have provided a total purchase price of $720,000 for a total interest purchased of 84%. On the closing date of October 30, 1967, however, two investors in the Gisselbeck group withdrew their support

when it appeared as if costs might exceed the amount specified in the construction contract and the transaction was not closed.

The groundbreaking for the center took place on October 31 as scheduled despite the lack of financing. Thereafter C-M and T & T entered an agreement with Gisselbeck and the Sioux Falls Holding Company (consisting of certain members of the previously assembled group of investors) whereby the investors would loan C-M and T & T $450,000 to build the project in exchange for interest at seven per cent and an option to purchase a 50 per cent equity interest in the shopping center upon its completion. On November 7, 1967, the proposal of C-M and T & T as hereinbefore described was presented to Western and accepted by Forrest Miller.

Additional factual material will be discussed in connection with subsequent portions of this memorandum.

## II. *Discussion*

### A. *Use of Summary Judgment in this Case*

In the present suit, Western is seeking to rescind the sale of the Sioux Falls Center upon three main grounds:

1. Shareholder approval of Western's shareholders was required for the sale but was not obtained.

2. The consideration paid in exchange for the center was so grossly inadequate that the sale may be set aside as void.

3. Defendants in this action, especially C-M, T & T, and Gisselbeck, were agents of Western and as such breached their fiduciary duty by diverting funds formerly available to Western to their own use. (The Gisselbeck allegation was not argued in plaintiff's memorandum nor were any materials presented to support it.)

The defendants in the instant motion seek summary judgment regarding all of the above allegations. 6 J. Moore, Federal Practice Para. 56.17 [27], at 2554–56 (2d ed. 1972) provides a general guideline for cases involving allegations of fraud.

"Summary judgment is apt to be inappropriate in an action based on a complex scheme of fraud where the court is asked to decide the motion on lengthy affidavits and documents and voluminous depositions. In ruling on the motion, the court should remember that the movant has the burden of demonstrating clearly the absence of any genuine issue of material fact, that the court should not draw factual inferences in favor of the moving party, and should not resolve a genuine issue of credibility. In this latter connection where the critical facts are in the possession of the moving party, the desirability that he submit himself to cross-examination in open court is a factor to be considered in light, however, of the fact that due to the territorial limits of a subpoena this goal may not be realized. If, however, the moving party's materials are sufficient in themselves, the party opposing summary judgment cannot hold back his evidence until trial, but must present counter-affidavits or other extraneous materials, pursuant to Rule 56(e), that raise a triable issue of fact or, in accordance with Rule 56(f), show that he is presently unable to do so. And this general rule has been applied to the situation where the critical facts are said to be in the possession of the moving party.

"In general, then, an issue of fraud, whether interposed as the basis of a claim or defense, may be summarily adjudicated where the issue of fraud is patently sham or is immaterial; or where, having substance, the moving party's papers clearly establish that there is no genuine issue of fact. If not so shown, a motion for summary judgment should be denied." (Citations omitted.)

In Clausen & Sons, Inc. v. Theo. Hamm Brewing Co., 395 F.2d 388 (8th. Cir. 1968), the trial court had granted summary judgment regarding the contract claim in an action based on Sherman and Clayton Act claims as well as contract claims. The Eighth Circuit Court of Appeals reversed the summary judgment. At 389 the Court stated:

"We need not repeat in detail our concern of summary dismissal under Rule 56. If there exists the slightest doubt as to a factual dispute or 'genuine issue of fact,' summary judgment should be denied. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); Williams v. Chick, 373 F.2d 330 (8 Cir. 1967); Larsen v. General Motors Corp., 391 F.2d 495, 8 Cir., March 11, 1968."

In Traylor v. Black, Sivalls & Bryson, Inc., 189 F.2d 213, 216 (8th Cir. 1951), the Court admonished that:

"A summary judgment upon motion therefor by a defendant in an action should never be entered except where the defendant is entitled to its allowance beyond all doubt. To warrant its entry the facts conceded by the plaintiff, or demonstrated beyond reasonable question to exist, should show the right of the defendant to a judgment with such clarity as to leave no room for controversy, and they should show affirmatively that the plaintiff would not be entitled to recover under any discernible circumstances."

Judge Devitt has recognized the Eighth Circuit's advice to grant a motion for summary judgment sparingly in Noel Transfer & Package Delivery Service, Inc. v. General Motors Corp., 341 F.Supp. 968, 969 (D.Minn.1972), as has Judge Neville in Williams v. United States, 336 F.Supp. 1392, 1393 (D.Minn. 1972).

Rule 56(c) indicates that:

"The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

In addition, Rule 56(e) sets forth the requirements that 1) "affidavits shall be made on personal knowledge;" 2) "shall set forth such facts as would be admissible in evidence;" 3) "[s]worn or certified copies of all papers . . . referred to in an affidavit shall be attached thereto or served therewith;" and 4) "[w]hen a motion for summary judgment is made and supported" with materials provided for in Rule 56, "an adverse party may not rest upon the mere allegations or denials" in that party's pleadings, but by affidavits or other material provided for by Rule 56, "must set forth specific facts showing that there is a genuine issue for trial."

■ In conjunction with their motion, defendants have supplied affidavits and documents attached thereto. Plaintiff has responded with documents, affidavits, certain admissions by defendants, and deposition testimony of Ellsworth Johnson taken during the proceedings preceding the case of McPherson, McCann, et al. v. Western Land Corp., No. 4–68–Civ. 216, previously before this Court. For purposes of this motion and with reference only to Rule 56, plaintiff's supporting materials for its motion as required by Rule 56(e) would appear to be flimsy at best. For the most part, the exhibits attached to plaintiff's brief and relied upon therein to establish the factual conflicts alleged are neither referred to in affidavits nor attached thereto or served therewith. The documents appear to be nothing more than items secured from Western's files and attached to the brief. Plaintiff supplied the Court with three affidavits, two of them being by stockholders with relevance only to Western's program of divestiture during 1967, and the third being that of B. A. Savage, the now presi-

dent of Western. Savage's only knowledge of the transactions in question comes from his reference to company records from which he has extrapolated the course of the company's business during the period in question in this lawsuit, and from later conversations with former officers of the company who have told him what purportedly transpired in 1967. Plaintiff's use of answers to requests for admissions are, of course, entirely appropriate, as is reference to those materials which defendants have supplied with reference to their motion for summary judgment. 6 J. Moore, Federal Practice Para. 56.11 [1.—3], at 2146 (2d ed. 1972), indicates that "use may be made of all depositions lawfully taken and duly filed in a former action which involved the same subject matter and the same parties or their privies as the action at bar." In addition 4a J. Moore, Federal Practice Para. 32.08, at 32–37–32–38 (2d ed. 1972), states:

"The deposition of a party taken in a prior dismissed action may be used in the federal court by an adverse party for any purpose, including the use as evidence of admissions, against the party, or the representative or successor in interest of the party whose deposition was taken.

"Under the more orthodox practice, in order for the deposition to be admissible in the second action, the parties must be the same, or their privies, and the issues must be substantially the same. But this practice has yielded in appropriate situations to admissibility where there is solely an identity of issues between the two actions."

In the *McPherson* case, as I understand it, the issues involved were similar to the case at bar and the parties, although aligned differently, were substantially as here. It would appear, therefore, that the prior deposition testimony would be admissible for the purposes of the present motion.

Although at first impression the documents, and Savage's deposition based upon knowledge gained through perusal of the files and conversations with other parties previously involved, would seem to be inappropriate for use under Rule 56(c) and (e), the Court must not forget the explicit warnings of the 8th Circuit nor the admonition of Judge Hutcheson in Whitaker v. Coleman, 115 F.2d 305, 307 (5th Cir. 1940), that:

"It is quite clear that technical rulings have no place in this [summary judgment] procedure and particularly that exclusionary rules will not be applied to strike, on grounds of formal defects in the proffer, evidence proffered on tendered issues. While, therefore, it does not appear from the record that the transcript of Jones' testimony was in any manner defective or why the offer was refused, this is, we think immaterial. For the offer of the transcript certainly apprised the judge that there was relevant and important evidence which defendant appellant could and would tender on trial and notwithstanding this, he was refused a continuance to get the evidence and the matter was pressed at once and erroneously, to summary judgment."

The Second Circuit in Babdo Sales, Inc. v. Miller-Wohl Co., Inc., 440 F.2d 962 (2d Cir. 1971), cited the *Whitaker* case and quoted the following language:

"Summary judgment procedure is not a catch penny contrivance to take unwary litigants into its toils and deprive them of a trial, it is a liberal measure, liberally designed for arriving at the truth. Its purpose is not to cut litigants off from their right to trial by jury if they really have evidence which they will offer on trial, it is to carefully test this out, in advance of trial by inquiring and determining whether such evidence exists. Whitaker v. Coleman, 115 F.2d 305, 307 (5 Cir. 1940.)" 440 F.2d at 965.

■ It appears from the above references and the 8th Circuit's decided bias against use of summary judgment procedures that any doubts regarding the admissibility of any evidence relied on by plaintiff should be resolved in its favor. *Whitaker* would even indicate that if the evidence is inadmissible for purposes of this motion, but indicates that plaintiff could and would offer evidence as to a material issue of fact at trial, that summary judgment should be avoided. Such a viewpoint seems to fly in the face of the language of Rule 56(c) and (e) but at the same time may be obeisance to its spirit. Adopting that point of view, the Court may then proceed to the issues of this case.

### B. *Shareholder Approval*

Western claims, and defendants do not dispute, that shareholder approval was not obtained for the sale of the unbuilt Sioux Falls Center. The issue turns, therefore, upon the interpretation of the Delaware statute in light of this undisputed fact. Delaware General Corporation Law, § 271(a), reads:

"Every corporation may at any meeting of its board of directors sell, lease, or exchange all or substantially all of its property and assets, including its good will and its corporate franchises, upon such terms and conditions and for such consideration, which may consist in whole or in part of money or other property, including shares of stock in, and/or other securities of, any other corporation or corporations, as its board of directors deems expedient and for the best interests of the corporation, when and as authorized by a resolution adopted by a majority of the outstanding stock of the corporation entitled to vote thereon at a meeting thereof duly called upon at least 20 days notice. The notice of the meeting shall state that such a resolution will be considered."

The precursor of this statute was interpreted in Greene v. Reconstruction Finance Corp., 100 F.2d 34 (1st Cir. 1938), in which the trustee in bankruptcy sought to use the statute in challenging transfer of the corporation's assets. The Court held that:

"[T]he provisions of Sec. 65 of the Delaware Code were not enacted for the protection of the corporation or of its creditors, but were intended for the protection of stockholders only." 100 F.2d at 36.

The Court in *Greene* relies upon Westerlund v. Black Bear Mining Co., 203 F. 599, 612–614, (8th Cir. Colo. 1913), which interpreted a Colorado statute prohibiting the encumbrance of mining property or machinery without a meeting and majority approval by the mining corporation's shareholders. The Court, at 613, held:

"[A] corporation which has executed and accepted the benefits of a contract within the scope of its powers, that is neither wrong in itself nor against public policy, and that is defective only because in its execution the corporation has failed to comply with some legal requirement enacted for the sole benefit of third persons, is estopped to assail it, and the beneficiaries of the corporation alone may avoid it. Hence the stockholders of this corporation, and they alone, have the right to avoid this lease because they alone had any interest in a compliance with the legal requirement that they should assent to its execution."

■ Plaintiff asserts that because in *Greene* the action of the Board of Directors was later ratified by the shareholders, the case is distinguishable from that at hand. The principal issue, however, would not appear to be the right of the corporation itself to raise rights waived by the shareholders, but the right of the corporation to raise shareholders' rights at all. Greene states unequivocally that the provisions of the statute were intended for the protection of the shareholders *only*. Therefore, this Court holds as a matter of law that shareholder ap-

proval is not at issue here. Such a holding eliminates the need to examine whether the corporation had divested itself of all or substantially all of its assets in the period involved or whether such divestitures were in the normal course of Western's operations.

### C. *Inadequate Consideration—*

The consideration recited in the sales agreement referred to above included, *inter alia,* payment of $294,000 and termination of architect's and contractor's contracts and claims arising thereunder. Plaintiff in its brief recognizes that "the sale price was in the area of 200 to 250 thousand dollars (depending on the interest rate computed)." Defendants allege via an affidavit of Willard Thorsen and the architect's contract dated September 5, 1966, an invoice, and a letter referred to therein and appended thereto, and the affidavit of Michael Merz, that the forgiveness of the architect's and contractor's contracts were equivalent to consideration of over $450,-000: $120,000 worth of work performed by the architect plus $60,000 in profit and $50–70 thousand dollars for work performed by the contractor, plus an additional sum for profit. Plaintiff in its memorandum denies that the agreement between Western and T & T was in effect at the time of the sale and that the amount claimed by C-M as having been completed on the contract date was excessive. Plaintiff offers no evidence to prove its allegations concerning the contractor's charges. Plaintiff relies, to show that there was no contract between Western and T & T, on exhibits to its memo not attached or referred to in affidavits, and to the prior testimony of E. Johnson in the *McPherson* case wherein Johnson indicated that the agreement between Western and T & T had been that no compensation was due T & T until the project had been built. These materials, at least the documents, are poor evidence, as indicated previously.

■ But even assuming that plaintiff's allegations are true and that be-

tween 200 and 250 thousand dollars passed to Western in the deal, the Court can still find as a matter of law that such consideration is not so clearly inadequate as to void the contract. It is elementary contract law that the Court will not set aside a contract for inadequacy of consideration if something of value has passed between the parties. 17 C.J.S. Contracts § 127 (1963) states at 843:

> "The law will not weigh the quantum of consideration, and so long as it is something of real value in the eye of the law, it is sufficient.
>
> \*   \*   \*   \*   \*   \*
>
> "The slightest consideration is sufficient to support the most onerous obligation; the inadequacy, as has been well said, is for the parties to consider at the time of making the agreement, and not for the court when it is sought to be enforced."

C.J.S. cites to Estrada v. Hansen, 215 Minn. 353, 10 N.W.2d 223 (1943), in which the Court states:

> "It is an elementary principle of contract law that courts will not inquire into the adequacy of consideration. 'It is unnecessary that a consideration should be adequate. It is sufficient if it is something which the law regards as of value.' 2 Dunnell, Dig. § 1756." 215 Minn. at 356, 10 N.W.2d at 225–226.

■ This Court finds as a matter of law that the consideration paid as indicated by both parties aside from the contested amounts was not so inadequate as to display on its face fraud.

### D. *Fraud and Breach of Fiduciary Duty*

■ The essence of plaintiff's allegations regarding breach of fiduciary duty appears to be that various of defendants perpetrated a fraud upon Western by secretly conspiring among themselves in violation of certain fiduciary relationships to convert to their own use financing opportunities that should have been made available to Western. It is defend-

ants' position that C-M and T & T had no fiduciary relationship beyond that of contractor and architect, that Gisselbeck was no longer working on a commission basis when he assembled the final financing arrangement for Western (not argued by plaintiff here), that Western knew of the negotiations between C-M and T & T with the investment group, and that the financing opportunity open to C-M and T & T was not open to Western because of Western's shaky financial condition. Five areas of possible factual conflict appear in a comparison between plaintiff's and defendants' moving papers. This section of this memorandum decision will attempt to outline those areas. References will also be made to those materials used to support the positions of the parties.

### 1. *Maximum Fixed Contract Price*

Plaintiff contends that there was a maximum fixed contract price in this transaction. Plaintiff also contends that at the closing meeting for the 84% transaction two of the potential investors backed out when C-M and T & T indicated that construction costs could go beyond that stipulated in the contract. Therefore plaintiff argues that these representations were fraudulent and part of the scheme to have the deal fall through so that C-M and T & T could get the financing for themselves. Plaintiff relies in this motion upon answers for request for admission #8 by both C-M and T & T in which each admits that:

> "On May 12, 1967, and up until the time Western Land allegedly sold Western Mall Shopping Center, Western Land had a valid and binding contract with [C-M] to build the center per certain plans and specifications at a total maximum cost . . . for $3,962,000."

Plaintiff also relies on the Savage affidavit wherein it is stated that:

> "On September 22, 1970, Mr. Forrest Miller, a former Vice President of Western Land, stated to this affiant that the maximum price Western Land would ever have had to pay under its construction contract with Crawford-Merz Co. was $3,962,000 . . . ."

Plaintiff also relies upon Article 17 of the contract between the contractor and Western entitled Maximum Contract Sum found in defendants' joint submission for their motion.

In opposition to these materials, defendants' present affidavits of Willard Thorsen and Michael Merz indicating that the maximum price was subject to possible modifications due to factors as yet undetermined at the time of the contract. Appended to Merz' affidavit is the contract between Western Land and C-M, a part of which is exhibit A that indicates that "the maximum cost shall be adjusted up or down" depending upon completion of the final plans.

### 2. *The Relative Financial Stability of C-M and Western*

Western argues that if it can be shown in fact that C-M was a poorer risk than Western, then it is possible to dispute defendants' claim that the financing finally offered to the C-M—T & T combination was unavailable to Western. Plaintiff relies on certain materials to demonstrate that Western's equity was much better than C-M's: 1) an exhibit indicating Western's net worth as of Oct. 31, 1966; 2) a diary entry by Ellsworth Johnson indicating his reservations about defendants' ability to carry the project; 3) Thorsen's admission in deposition testimony from the *McPherson* case that T & T and C-M could not raise the money themselves and had to come up with another source; and 4) C-M's financial statement which lists net worth as of December 31, 1966, at $332,000. Contrary to the evidence offered by plaintiff, defendants present the affidavit of Bruce De Jager, a major investor in the final deal, who states that "I would not have participated in any similar loan/option financing with Western Land Construction." It is again instructive to note

that of the material offered by plaintiff, only the prior deposition testimony of defendant Thorsen is admissible under the language of Rule 56.

### 3. *Western Land's Knowledge of C-M and T & T Financing Arrangements with the Gisselbeck Group*

Plaintiff argues that defendants conspired to put together their final financial package and that those people in charge of Western's operations at that time were unaware that C-M and T & T were backed by the Gisselbeck group. Plaintiff relies both on Ellsworth Johnson's prior deposition testimony from the *McPherson* case and on a page from his diary which indicates that he did not know about the arrangements. It also relies on an affidavit by a Mr. Geeson which indicates that he was approached early in November by Forrest Miller who asked that the Klinger Contractor group participate in the financing of the Sioux Falls project. Plaintiff argues from this affidavit that if Miller knew that the Gisselbeck financing was being planned by the defendants and that an offer would come as soon as November 7, Miller would not have been running around the country looking for more investors.

The Court believes that this knowledge question is relevant only if T & T and C-M had a duty to keep plaintiff informed of what they were doing regarding their attempts to finance the deal. This question turns upon a resolution of what duties were in fact owed by defendants to plaintiff in their roles as contractor and architect. These duties are defined by a factual determination of the nature of the relationship between the parties, and neither party has produced enough facts to determine whether the connection between the two main defendants and the plaintiff went beyond that of independent contractors to a more fiduciary type of responsibility. This area of inquiry may well be an area that a trial would have to elucidate and resolve.

### 4. *Access to Financing*

Western argues that it had access to other sources of financing which were turned down not because of their expense, as defendants allege, but because the 84% deal was pending. Plaintiff argues that after the 84% deal fell through (due to defendants' treachery) Western had no choice but to comply with the final deal offered by the defendants. The materials used by both parties in these arguments are similar to those outlined above for the previous potential factual issues. Again, this consideration becomes relevant only if there is proof of a fiduciary relationship and breach of fiduciary duty. If there is not fiduciary duty or fraud in breaking up the 84% deal, whether other financing was available to Western or not appears to be irrelevant.

### 5. *Western Land's Need for Additional Funds*

Plaintiff argues that the contract price for the construction of the Sioux Falls Center was set artificially high. In addition, after the contract was entered, changes were made in the plans for the heating and air conditioning unit. Instead of the unit planned, a Hattis total energy system was to be installed, a change which potentially might have saved up to $400,000 in the construction costs. Plaintiff contends that because the Hattis unit might potentially have saved a considerable amount of money, C-M should have lowered its contract price. Had C-M lowered its price by $300,000 Western would not have had to seek out the $300,000 it needed before beginning construction of the Center. By not lowering its price, C-M arguably forced Western into the position of having to accept the offer by C-M and T & T. Plaintiff relies on a memorandum (again not connected with an affidavit) from F. Miller to L. Crews in which Miller indicates that Ray Merz feels the extra cost to be eliminated could be as high as $450,000 instead of $357,000." In addi-

tion, Western points to admissions by Thorsen in which Thorsen recalls that "Hattis estimated savings of at least $.50 per square foot" and by Merz who admits that "a savings of 1 dollar a foot in construction cost was originally and very generally estimated by Hattis in May, 1967." Defendants respond with affidavits indicating that there was no way to rely on the saving projected by the Hattis unit and that the unit ended up costing more, rather than saving money.

Again, this issue raises the question of the scope of the duty of C-M and T & T to Western to lower prices. It would appear that in a normal contractor-employer relationship, such duty would not be present. As mentioned above, the extent of the duty between the plaintiff and defendants C-M and T & T may have to be determined factually. There are allegations that both defendants had done work with Western on a long term basis and there may be some grounds for a relationship that goes beyond the normal employer-independent contractor situation. 2A C.J.S. Agency § 12 (1972), at 569, outlines the scope of inquiry for determining the scope of the duties involved:

> "Generally the distinction between the relation of principal and agent and employer and independent contractor is based on the extent of the control exercised over the employee in the performance of his work, he being an independent contractor if the will of the employer is represented only by the result, but an agent where the employer's will is represented by the means as well as the result."

As far as the Court can see, Western has offered no proof that would indicate a principal-agent relationship other than that of the prior deposition testimony of E. Johnson in which he refers to the working agreement between T & T and Western regarding non-payment of fees until the project was a certainty.

### III. *Conclusion*

Admittedly, Western has made a very weak case for the Court to justify not granting the summary judgment. The Eighth Circuit, however, has made clear its position that summary judgment should not be granted if there are facts that would indicate factual conflicts between plaintiff and defendant. Looking at the issue of fraud and breach of fiduciary duty in this case most favorably toward plaintiff, and ignoring the technical problems of compliance with Rule 56, it is possible to discern factual issues which, if proven by competent evidence in favor of plaintiff, require resolution by trial.

The Court is of the opinion that after the evidence has been submitted in this case, a directed verdict might well be in order. The tenor of summary judgment decisions generally, however, is that even if a directed verdict may be the likely result, the plaintiff is entitled to an in court presentation of the facts if there are any grounds for finding factual conflicts between plaintiff and defendant.

It is therefore ordered:

1. That the motion of defendants for summary judgment on the issue of shareholder approval be granted.

2. That the motion of defendants for summary judgment on the issue of inadequate consideration be granted.

3. That the motion of defendants for summary judgment on the issue of fraud and breach of fiduciary duty be denied.

Defendant Game at the hearing appeared *pro se* and asked that he be dismissed from the case because he has sold his interest to Merz. He also moved for partial summary judgment but he has filed no direct pleading and no response has been made by plaintiff regarding his complete dismissal from the suit. In the absence of some factual showing by Game that he is not a proper defendant, he must remain a defendant. Defendant Game's motion is denied.