**GREAT DESTINATIONS, INC., Plaintiff,**

v.

**TRANSPORTES AEREOS PORTUGUES- ES S.A.R.L., Defendant.**

**No. 76 Civ. 4974.**

United States District Court, S. D. New York.

Nov. 21, 1978.

---

Lovejoy, Wasson, Lundgren & Ashton, P. C., New York City, for plaintiff; Morton Apfeldorf, New York City, of counsel.

John M. Burns, III, New York City, Verner, Liipfert, Bernhard, McPherson & Alexander, Washington, D. C., for defendant; Stuart F. Pierson, Ann K. H. Simon, Washington, D. C., of counsel.

## OPINION

SWEET, District Judge.

This action arises out of two alleged contracts between Great Destinations, Inc. (GDI) and Transportes Aereos Portugueses, S.A.R.L. (TAP). GDI, a New York tour operator specializing in group charter travel, contacted TAP, an overseas air carrier, in April 1976 to arrange transportation for two series of charters to commence in June 1977. David Lurie, vice president of GDI, spoke with Mr. Van Labriola, a TAP employee, concerning the dates of the proposed Portugal trips. On April 27 Gloria Duarte, TAP's Bulk Sales Supervisor, wrote to Lurie to confirm the availability of TAP aircraft for flights to Portugal on the dates Lurie had requested and specified a round trip price of $193 per seat. Also during April, Lurie discussed with TAP employees a series of charters to Kenya. Thus, Gloria Duarte wrote letters in early May to Lurie, informing him that TAP was negotiating for the price and availability of "747" planes.

Based upon the April 27 letter, GDI started to arrange for accommodations and other services for the Kenya trips. Lurie and Gilbert Yalman, GDI president, went to Portugal in connection with the proposed charters. TAP arranged for Lurie's and Yalman's flights to and from Portugal. While in Portugal, Lurie and Yalman made preliminary arrangements with several hotels for the proposed charters.

After returning from Portugal, Lurie spoke with Gloria Duarte on June 8, and he claims to have accepted orally the TAP "offer" as reflected in Duarte's letter of April 27. On June 11 Lurie and Yalman of GDI met Duarte and other representatives of TAP, and GDI claims to have reconfirmed its acceptance of the TAP "offer."

Also in the spring of 1976, Lurie began to communicate with TAP about air transportation for a series of trips to Kenya. These communications included oral and written exchanges with TAP employees Duarte and Evaristo. One such letter dated May 7, 1976 from Duarte to Lurie confirmed the availability of a number of aircraft and indicated that TAP would provide written contracts "as soon as we have confirmation from our Head Office." *Simon affidavit* of August 4, 1978, Exhibit 2.

In August of 1976 TAP employee Evaristo sent to Lurie two unsigned partially filled out form contracts, one for the Portugal trips and one for the Kenya trips. The Kenya form contract specified, *inter alia,* a price of $155,660 per charter flight; 8 flight dates between June 25, 1977 and August 20, 1977; aircraft type ("B–747"); charter space ("40 passengers or more"); cancellation fee; and manner of payment. Exhibit 3. The Portugal form contract specified terms analogous to those contained in the Kenya form contract. *Simon affidavit* of August 4, 1978, Exhibit 5.

Upon receipt of the two form contracts, GDI continued to make preliminary arrangements for the tours by contacting travel agents and preparing prospectuses required by the Civil Aeronautics Board. Meanwhile, in September of 1976, GDI and TAP agreed to certain "add-on" prices above the previously agreed upon $193 per seat for the Portugal trips. These "add-ons" were designed to accommodate potential tour participants from areas outside New York City.

On October 8, 1976, Mr. Paul Elmstrom of TAP wrote to GDI, stating: "We still have a price problem regarding your program to Portugal . . . ." *Lurie affidavit* of

September 18, 1978, Exhibit D. Instead of the previously quoted price of $192.50 per seat, TAP now offered a price of $300. Unable to agree upon a price for the Portugal trip, the parties did not execute a formal written contract. Apparently because of the dispute over the Portugal trips, the Kenya deal also fell through.

During pretrial discovery on a contract claim, GDI uncovered evidence which allegedly indicates that TAP and three tour operators had established a policy of exclusive dealing.[1] GDI then amended its complaint, adding a fraud claim, a claim based on Section 404(b) of the Federal Aviation Act,[2] and an antitrust claim based on Sections 1 and 2 of the Sherman Act.[3]

TAP has moved for summary judgment on all four claims described in the preceding paragraph. Summary judgment is hereby denied as to all claims except the Federal Aviation Act claim.

### The Contract Claim

 GDI's contract claim is not barred by the New York statute of frauds.[4] Under New York law, the statute of frauds provision is inapplicable if there is at least one writing, signed by the party to be charged, which establishes a contractual relationship between the parties. That writing, although it must contain sufficient evidence of the contract, need not contain all of the terms of the contract; other terms may be set out in separate writings, signed or unsigned. *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 55–56, 110 N.E.2d 551 (1953); *Flammia v. Mite Corp.*, 401 F.Supp. 1121, 1133 (E.D.N.Y.1975); *Kobre v. Instrument Systems Corp.*, 54 A.D.2d 625, 387 N.Y.S.2d 617 (1976).

 In the case at bar, plaintiff relies upon the following writings with respect to the aborted Portugal trips: the April 27 letter from TAP's Gloria Duarte to GDI's David Lurie and the unsigned TAP form contract sent to Lurie in August, 1976. With respect to the aborted Kenya trips, plaintiff relies upon a letter dated May 7, 1976 from Duarte to Lurie, a letter dated August 6, 1976 from Duarte to Lurie, and an unsigned, partially filled out TAP form contract sent to Lurie in August, 1976. These writings, taken together, satisfy the statute of frauds. Regarding the Portugal trips, the April 27 letter sets forth the essential terms, including price, destinations, dates, and availability of aircraft. The form contract expanded upon these terms.[5] Similarly, with respect to the Kenya trips, the two letters set forth destination, dates, type of aircraft and number of flights. Although the Kenya letters do not refer to price, internal documents of TAP indicate a price of $155,660, and TAP officials have admitted that there is no controversy regarding the price of the Kenya trips. Omission of the price term here does not

---

**1.** This evidence includes, *inter alia*, a September 23, 1976 memorandum from TAP's Paul Elmstrom stating "at this time, and for the foreseeable future I do not want any more charter tour operators;" and a July 8, 1976 memorandum from Paul Elmstrom indicating that the "Globus Gateway" program "is based upon your working in conjunction with . . ." one of the other allegedly favored tour operators.

**2.** 49 U.S.C. § 1374(b).

**3.** Plaintiff's Section 1 claim is based on the theory that TAP acted in concert with three tour operators in providing exclusive air transportation for them. Its Section 2 claim states that TAP monopolized or attempted to monopolize the charter tour by suppressing competition and regulating prices.

**4.** N.Y.G.O.L. § 5–701(a)(1), McKinney (1978) states:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
> (1) By its terms is not to be performed within one year from the making thereof . .

**5.** In *Crabtree* the New York Court of Appeals stated:

> The statute of frauds does not require the "memorandum * * * to be in one document. It may be pieced together out of separate writings, connected with one another either expressly or by the internal evidence of subject-matter and occasion". 305 N.Y. at 54, 110 N.E.2d at 553.

mean that the statute of frauds must apply, because the omission is not of an "essential term" since it is not in dispute.

The concept of "essentiality" is relative. A term is "essential," and must thus appear in the "memorandum," if it seriously affects the rights and obligations of the parties and there is a *significant evidentiary dispute* as to its content. *Ginsberg Machine Co. v. J. & H. Label Processing Corp.,* 341 F.2d 825 (2d Cir. 1965). The TAP form contract embodied these terms, although the number of flights was reduced from six to four.[6]

Because these writings contain the essential terms of two contracts between GDI and TAP, and because TAP signed at least one writing for each contract, a contractual relationship sufficient to overcome the statute of frauds attack has been established.

### The Fraud Claim

■ Defendant also moves for summary judgment regarding plaintiff's second claim—that GDI was fraudulently induced by TAP to undertake certain actions, and that in consequence it incurred damages.

In a motion for summary judgment the burden is on the moving party to establish that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; see *Adickes v. S. H. Kreis & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). On the papers submitted by the parties, there is an inadequate factual basis to conclude that there was no fraud. The motion for summary judgment on this ground is therefore denied.

### The Federal Aviation Act Claim

Defendant's motion is granted with respect to the Federal Aviation Act, Section 404(b) claim. In relevant part, that section provides:

No carrier or foreign air carrier shall make, give, or cause any undue or unreasonable preference or advantage to any particular person . . . in any respect whatsoever or subject any particular person . . . to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

The key issue is whether GDI, a broker/dealer of air transportation services, had standing to assert its claim. In 1975 the Supreme Court announced the showing that a party must make to establish standing. This showing includes, *inter alia,* that the party is within the class of persons for whose special benefit the statute was enacted. *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

■ It has been established that Section 404(b) was enacted to benefit "persons, including passengers, using the facilities of air carriers." *Fitzgerald v. Pan American World Airways,* 229 F.2d 499, 501 (2d Cir. 1956); *see also Nader v. Allegheny Airlines, Inc.* 445 F.Supp. 168, 172 (D.D.C.1978). The Honorable Robert J. Ward has recently undertaken a searching analysis of the standing issue, and has held that a travel agent has no private right of action under Section 404(b).[7] *Sanders v. Air India,* 454 F.Supp. 1371 (S.D.N.Y.1978 (Ward, J.))[8]

Judge Ward's analysis in *Sanders* is adopted here. GDI contacted TAP with an eye toward reselling airplane seats to the public. GDI did not intend to take passage on TAP airplanes, nor did it intend for its property to take such passage. GDI is a regulated dealer in air transportation services, a middleman interposed between the

---

**6.** This reduction had previously been agreed to in the course of discussions between Lurie and Duarte.

**7.** Other courts have made similar findings. *See, e. g., Caceres Agency, Inc. v. Lufthansa German Airlines,* 15 Aviation Cases § 17 (S.D. N.Y. June 29, 1978).

**8.** *Contra: William Becker Travel Bureau, Inc. v. Sabena-Belgian World Airways,* 13 Aviation Cases § 17 (S.D.N.Y.1975). As Judge Ward noted in *Sanders,* Becker took an "expansive view of the class of intended beneficiaries of § 404(b)". *Id.* . . . But as Judge Ward also noted, *Becker* predates the Supreme Court's opinion in *Cort, supra.*

public and the airline; it is not a "user" as contemplated by *Cort* and *Sanders*. Therefore, the Section 404(b) claim will not lie.

### The Antitrust Claim

█ Asserting that summary judgment is appropriate for the antitrust claim, defendant relies heavily on the doctrine of regulatory immunity. It is true that the Federal Aviation Act provides immunity from the antitrust laws in certain instances. Thus, Section 414, 49 U.S.C. § 1384, grants immunity where conduct is approved by a CAB order made pursuant to Section 412 of that Act. Section 412, in turn, provides that written and oral agreements to which an air carrier is a party must be filed with the CAB, which is to determine, *inter alia*, whether such agreements are in the public interest. If approved by the CAB, the agreements become immune from the antitrust laws. In the case *sub judice* no agreement between TAP and the three allegedly favored tour operators was submitted to, authorized, or approved by the CAB pursuant to Section 412; therefore Section 414 cannot shield TAP from the antitrust claim.

█ Nevertheless, defendants assert that the case at bar falls under the doctrine of regulatory immunity enunciated by the Supreme Court in *Pan American World Airways v. United States*, 371 U.S. 296, 304–05, 83 S.Ct. 476, 9 L.Ed.2d 325 (1962) and *Hughes Tool Co. v. Trans World Airlines*, 409 U.S. 363, 387, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973). This reliance is misplaced because in each of the cited cases the alleged antitrust violation arose out of matters directly regulated by the CAB. In the former case the Supreme Court "hesitate[d] to hold that [Congress' adoption of the regulatory scheme administered by the Civil Aeronautics Board] was designed completely to displace the antitrust laws . . . ." *Pan American World Airways v. United States*, 371 U.S. at 304–05, 83 S.Ct. at 482. In holding that the complaint in *Pan American* should have been dismissed, the Court noted that the narrow questions therein presented had been entrusted by Congress to the CAB:

The acts charged in this civil suit as antitrust violations are precise ingredients of the Board's authority in granting, qualifying or denying certificates to air carriers, in modifying, suspending, or revoking them, and in allowing or disallowing affiliations between common carriers and air carriers.

*Id.* at 305, 83 S.Ct. at 482 (footnote omitted).

In *Hughes Tool Co.*, the Court "repeat[ed] . . . what we said in the *Pan American* case that the Federal Aviation Act does not completely displace the antitrust laws." *Hughes Tool Co. v. Trans World Airlines, supra*. The complaint in *Hughes Tool Co.* arose out of the manner in which Hughes Tool Co. had exercised its controlling interest in TWA, especially its alleged attempt to control the acquisition and financing of aircraft by TWA. In holding that Hughes Tool Co.'s actions had immunity under the antitrust laws, the Court stressed the involvement of the CAB in these actions:

. . . where, as here, the CAB authorizes control of an air carrier to be acquired by another person or corporation, and where it specifically authorizes as in the public interest specific transactions between the parent and the subsidiary, the way in which that control is exercised in those precise situations is under the surveillance of the CAB, not in the hands of those who can invoke the sanctions of the antitrust laws. As noted, the parent company which controls an air carrier is subject to *pervasive control* by the CAB.

409 U.S. at 387, 93 S.Ct. at 661 (emphasis supplied). Unlike the situation in *Hughes Tool Co.*, the actions complained of here have not been under prolonged and close supervision by the CAB. Thus the two Supreme Court cases do not control, and there is no immunity from the antitrust laws. Summary judgment is therefore denied as to the antitrust claims.

Defendant shall submit to the clerk of this court a partial judgment, on notice, consistent with this opinion as regards the Federal Aviation Act claim. Furthermore, defendant's separate motion to amend its

answer is granted to the extent necessary in light of this opinion.

IT IS SO ORDERED.