**Lloyd BIGGLE, Jr. and Damon Knight, Plaintiffs-Appellants,**

v.

**HARPER & ROW PUBLISHERS, INC., A Delaware Corporation, Defendant-Appellee.**

No. 80–1579.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 5, 1982.

Decided March 31, 1982.

Alex Berman, Kozlow, Woll, Crowley & Berman, Southfield, Mich., for plaintiffs-appellants.

Wallace Handler, Snyder & Handler, Birmingham, Mich., Alfreida B. Kenny, Harper & Row Publishers, Inc., New York City, for defendant-appellee.

Before LIVELY and KEITH, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

LIVELY, Circuit Judge.

In this diversity action the district court granted summary judgment for the defendant on one count of the complaint and certified the case for immediate appeal pursuant to Rule 54(b), F.R.Civ.P. The question in the case is whether certain writings relied upon by the plaintiffs were sufficient to satisfy the requirements of the statute of frauds. The district court held that the writings were not sufficient and dismissed the plaintiffs' breach of contract claim.

## I.

The plaintiffs Biggle and Knight approached the defendant Harper & Row with the idea of publishing an anthology of science fiction stories which would be used primarily in high school and college courses. The entire anthology as proposed was to consist of eight volumes and a teacher's manual. In discussions with the plaintiffs, Hugh Van Dusen, the senior editor in charge of Harper & Row "Perennial Paperback" books, suggested that a series of four rather than eight volumes might be preferable. Nevertheless, on May 16, 1975 Van Dusen sent an inter-office memorandum to Elizabeth Jakab, an editor of the Perennial Paperback books, in which he stated, "I talked to Biggle and agreed to do the 8 books." The memorandum also stated, "We need a separate contract for each book . . .," and contained directions for forwarding contracts to the plaintiffs and terms of payment of advances. The memorandum was typed and unsigned. It was from "Hugh" to "Elis" and referred to "Damon Knight and Lloyd Biggle Science Fiction Project." It is reproduced in full as Appendix Exhibit A to this opinion.

On June 2, 1975 Elizabeth Jakab wrote Lloyd Biggle a letter in which she enclosed "the first of the contracts that will be coming from us for the volume tentatively entitled YESTERDAY PLUS TWO." On July 28, 1975 Ms. Jakab wrote to Biggle acknowledging receipt of three contracts, identified by titles, and forwarding three additional contracts covering different volumes, again identified by title. In this letter Ms. Jakab noted that there were two more contracts to come. All of the contracts were prepared by Harper & Row and those covering four of the volumes were executed by the plaintiffs and by a representative of Harper & Row. The contracts for three other volumes were signed by the plaintiffs and returned to the defendant, but were never signed on its behalf.

Harper & Row issued an announcement of the forthcoming publication of THE SCIENCE FICTION UNIVERSE which identified Knight and Biggle as the editors. It described the publication as "a complete science fiction textbook in eight topically oriented paperback volumes." The title of volume one—YESTERDAY PLUS TWO—was given and the contents of volumes two through eight were described. This announcement is reproduced as Appendix Exhibit B to this opinion.

On November 12, 1975, after four contracts had been executed by all parties and three others had been prepared by the defendant and executed by the plaintiffs and returned to the defendant, Elizabeth Jakab wrote a letter to Lloyd Biggle which opened with a question:

> Do you think you and Damon might be able to pack the Science Fiction Universe into four volumes instead of eight? I know this is a rather staggering request, but truly it is less so than it sounds at first.

Biggle responded at length, giving various reasons for insisting that the series contain eight rather than four volumes. Eventually Van Dusen wrote Biggle on December

22, 1975 that Harper & Row would be "happy to try the first four volumes as a test," but if the plaintiffs would rather go with eight volumes, "the only advice we can offer is that you try another publisher who can see the project your way." This lawsuit followed.

## II.
### A.

The parties agree that the New York statute of frauds is applicable to their agreement. The statute provides:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
>
> 1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime . . . .

New York General Obligations Law, Section 5–701 (McKinney 1979).

The district court found that the plaintiffs had shown by the four fully executed contracts that a contractual relationship existed between them and the defendant. However, it found the execution of separate contracts to be inconsistent with an agreement that all eight volumes would be published. The four executed contracts were deemed to relate only to individual volumes, not to the entire anthology. The unsigned memorandum from Van Dusen to Ms. Jakab was held insufficient to establish the "underlying relationship regarding the anthology as a whole." In concluding that the plaintiffs failed to show the presence of "the essential core document," the district court did not refer to the November 12, 1975 letter which was signed by Ms. Jakab or the December 22, 1975 letter which was signed by Van Dusen. In both of these letters the anthology was referred to as "the Science Fiction Universe." In their complaint the plaintiffs alleged that the contract with Harper & Row called for the "publication, promotion and sale of a series of eight volumes of books the nature of

which was a science fiction anthology to be entitled The Science Fiction Universe." (Underlining in complaint).

### B.

The parties and the district court placed principal reliance upon the decision of the Court of Appeals of New York in *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 110 N.E.2d 551 (1953). We agree that *Crabtree* controls. In *Crabtree* the plaintiff claimed that he was hired as sales manager of a cosmetics firm for at least two years. He had sought a three-year contract at a fixed salary. During negotiations, which were primarily conducted by Robert P. Johns, the general manager of the defendant corporation, Miss Arden, the president, made an offer of a two-year contract with salary increases at the end of the first six months and of one year. A memorandum was typed by Miss Arden's secretary reflecting this offer. The unsigned memorandum was as follows:

EMPLOYMENT AGREEMENT WITH
NATE CRABTREE  Date Sept. 26—1947
At 681—5th Ave  6: PM

\*   \*   \*

Begin  20000.
6 months  25000.
6 "  30000.
5000.—per year Expense money
[2 years to make good]
Arrangement with Mr. Crabtree
By Miss Arden
Present Miss Arden
Mr John
Mr Crabtree
Miss OLeary

110 N.E.2d at 552.

Crabtree notified the defendant that he accepted "the invitation to join the Arden organization" and when he reported for work a payroll card was prepared by general manager Johns who initialed it before forwarding it to the payroll department. This card showed the names of the parties, Crabtree's job classification and the salary for the first six months, the second six months and after one year. The salary was increased after six months, but Miss Arden refused to approve the increase which the

memorandum called for at the end of one year. However, a payroll change card was prepared and signed by the comptroller noting a salary increase from $25,000 to $30,000 per year, "per contractual arrangements with Miss Arden." Miss Arden again refused to approve the increase and Crabtree brought suit for breach of contract. The defendant denied the existence of any agreement to employ Crabtree for two years, and pled the statute of frauds as a bar to enforcement if the court should find that an agreement had been made. The trial court upheld the plaintiffs' contentions and awarded damages. The Appellate Division affirmed and the question addressed by the New York Court of Appeals was whether there was a memorandum of the terms of the contract, subscribed by the defendant sufficient to satisfy the requirements of the New York statute of frauds.

The court of appeals affirmed the judgment for Crabtree upon the basis of its finding that the two payroll cards which were signed and the unsigned memorandum, when considered together, constituted a memorandum under the statute of frauds. The two signed documents were found to establish the existence of a contractual relationship and to set forth all the terms of the contract except one—the duration of Crabtree's employment. The notation on the unsigned memorandum, "2 years to make good," was found sufficient to establish the period of employment. The court adopted a rule that signed and unsigned writings may be read together so long as they clearly refer to the same subject matter or transaction. The holding and rationale of the court were summarized as follows:

> The language of the statute—"Every agreement * * * is void, unless * * * some note or memorandum thereof be in writing, and subscribed by the party to be charged", Personal Property Law, § 31—does not impose the requirement that the signed acknowledgment of the contract must appear from the writings alone, unaided by oral testimony. The danger of fraud and perjury, generally attendant upon the admission of parol evidence, is at a minimum in a case such as this.

> None of the terms of the contract are supplied by parol. All of them must be set out in the various writings presented to the court, and at least one writing, the one establishing a contractual relationship between the parties, must bear the signature of the party to be charged, while the unsigned document must on its face refer to the same transaction as that set forth in the one that was signed. Parol evidence—to portray the circumstances surrounding the making of the memorandum—serves only to connect the separate documents and to show that there was assent, by the party to be charged, to the contents of the one unsigned. If that testimony does not convincingly connect the papers, or does not show assent to the unsigned paper, it is within the province of the judge to conclude, as a matter of law, that the statute has not been satisfied.

110 N.E.2d at 554.

In its *Crabtree* opinion the court referred several times to its earlier decision in *Marks v. Cowdin*, 226 N.Y. 138, 123 N.E. 139 (1919). Speaking for the court in *Marks*, Judge Cardozo wrote, "The memorandum exacted by the statute does not have to be in one document. It may be pieced together out of separate writings, connected with one another either expressly or by the internal evidence of subject-matter and occasion." 123 N.E. at 141 (citations omitted). Thus, the process which has been referred to as considering a "confluence of memoranda," *Babdo Sales, Inc. v. Miller-Wohl Co.*, 440 F.2d 962, 966 (2d Cir. 1971), has long been recognized by the courts of New York as a proper means to avoid pressing the statute of frauds "to the extreme of a literal and rigid logic." *Marks v. Cowdin, supra,* 123 N.E. at 141.

### III.

The district court erred in concluding that the memoranda relied upon by the plaintiffs in this case did not satisfy the requirements of the New York statute of frauds. Referring to *O'Keeffe v. Bry*, 456 F.Supp. 822 (S.D.N.Y.1978), the district

court held that the plaintiffs had failed to establish the existence of "the essential core document." In reaching this conclusion the district court either misread *Crabtree* and *O'Keeffe* or overlooked the letter of November 12th from Elizabeth Jakab to Lloyd Biggle. In *O'Keeffe* the court held that "a core document evidencing a promise" must be present and that additional documents may be permitted to supply essential terms of the agreement, but "not to piece together the existence of the agreement itself." 456 F.Supp. at 829. Though the *Crabtree* court did not use the term "core document" it stated that "at least one writing, the one establishing a contractual relationship between the parties, must bear the signature of the party to be charged, while the unsigned document must on its face refer to the same transaction as that set forth in the one that was signed." 110 N.E.2d at 554.

The district court found that the four signed contracts could not serve as the "core" document because each related only to a single volume rather than to the anthology as a whole. Nevertheless, these four signed documents unquestionably demonstrated the existence of "a contractual relationship between the parties ...." *Crabtree, supra,* 110 N.E.2d at 554. In fact, the district court agreed that they did establish the existence of the relationship, but found them inconsistent with a claim that the anthology was to contain eight volumes. That this contractual relationship involved the publication of more than one volume is demonstrated by the very existence of separate contracts which refer to four volumes by name. The letter of November 12th refers to the anthology by name, "Science Fiction Universe" and broaches the question of whether the plaintiffs "might be able to pack" it into four volumes rather than eight. Taken together the signed documents establish that there was a contractual relationship between the parties, that it involved the publication of an anthology to be known as "Science Fiction Universe," to consist of several volumes, with the royalty and other terms including advances against royalties set forth in identical language in each of the four signed contracts.

There was no signed document which stated the exact number of volumes to be included in the anthology. However, the unsigned inter-office memorandum identified the "Science Fiction Project" and contained the statement that Van Dusen had talked with Biggle "and agreed to do the 8 books." In addition, this memorandum explained why separate contracts were being prepared for each volume. Further, the unsigned publication announcement identified the anthology by name and the first volume by title, and described the series as "a complete science fiction textbook in eight topically oriented paperbound volumes." Both of the unsigned documents qualified under the *Crabtree* test to be read together with the signed ones since they "clearly refer to the same subject matter or transaction." 110 N.E.2d at 554. Thus in the language of *Marks v. Cowdin, supra,* 123 N.E. at 141, quoted in *Crabtree,* 110 N.E.2d at 553, the plaintiffs relied upon a memorandum which "may be pieced together out of separate writings, connected with one another either expressly or by the internal evidence of subject-matter and occasion."

It was error to grant summary judgment for the defendant on the basis of the New York statute of frauds. We express no opinion on the merits of the plaintiffs' claim for breach of contract. However, they are entitled to a trial on this claim. We do not consider any of the other issues raised by the parties. The district court based summary judgment squarely on the statute of frauds and its Rule 54(b) certification presents that issue only on appeal. The judgment of the district court is reversed, and the case is remanded for further proceedings. The plaintiffs will recover their costs on this appeal.

## APPENDIX

### Exhibit A

HARPER & ROW, PUBLISHERS
MEMORANDUM

To: Elis             Date: 5/16
From; Hugh

Damon Knight and Lloyd Biggle
Science Fiction Project

I talked to Biggle and agreed to do the 8 books.

1) We need a separate contract for each book, so that they can cope with their accounting to authors

2) The contracts are with Biggle and Knight. You have Biggle's address and Lynn can give you Knight's.

3) Contracts to be sent to Knight.

4) Advance half on sig and half on acceptance of each

### Exhibit B

### HARPER & ROW

Perennial Library

*Announce the Forthcoming Publication of*

THE SCIENCE FICTION UNIVERSE

Edited by Damon Knight and
Lloyd Biggle, Jr.

A Complete Science Fiction Textbook in
Eight Topically Oriented
Paperback Volumes.

Specifically designed for use in high schools and lower-division college classes, the stories are graded according to the degree of difficulty of the ideas involved. A TEACHER'S MANUAL, written by the Editors and Marshall Tymn, will also be available. Together with the Editors' Notes, this manual will enable teachers to organize their courses to best meet the needs and capabilities of their students.

*Volume I*—YESTERDAY PLUS TWO. *To be published early in 1976, this volume contains stories grouped around two units of study:*

All in a Day's Work (and Play). Demonstrates the impact of science technology, and the future on man's work and daily life.

*Don't Blame Necessity.* Inventions dangerous and otherwise. The stories are chosen to provide an understanding of aspects of the physical universe.

*Volumes 2 through 8 will become available during the rest of 1976 and early 1977. They will each contain one or more of the following units:*

*Machine Bites Man.* The battle between men and machines and man's struggle to use machines rather than be used by them. This unit functions as an introduction to modern technology, computers, and automation and inevitably leads to a serious evaluation of what the machine has done for us—and to us.

*Elixirs of Life and Death.* Stories concerning drugs. As with machines, man's problem is to use them to his advantage rather than to his detriment.

*The Powers.* Stories about extraordinary beings and extraordinary forces. This unit provides an introduction to extrasensory perception and parapsychology and deals with the question of how far or how little one must deviate from the average in order to be more than human—or less.

*I'm a Stranger Here Myself.* Aliens from outer space and invaders of Earth, in all of their infinite variety.

*The Many Sides of Now.* An introduction to topology that also asks the question: "What is on the other side of a one-sided figure?" This unit introduces the concept of parallel worlds.

*Time on My Hands.* Time travel, forward and backward. Backward time travel is the opening door to paleontology, anthropology, geology, history, and related subjects. Time travel in either direction starkly sets off our twentieth-century selves.

*Outward Bound.* Two units on space travel and exploration: The Solar System, the Galaxy, and beyond.

*The Sound of Trumpets. The Alarms of War.* The only thing more terrifying than the last war is the next. Here are science fiction stories about future wars.

*Of Worlds Beyond.* Stories about alien life on alien worlds, with glimpses of utterly strange scientific, social, and cultural conditions and problems.

*The Strangest Universe.* Stories about the human mind.

*No Fathers to Guide Them.* Stories about artificial life.

*This Polluted Planet.* Stories concerning ecology.

*Let's All Cancel Tomorrow.* A bleak view of the future, disturbing and challenging because some of the trends in these stories are already with us.

*I Didn't Think It Would End Like That.* From the end of the world to the end of everything.

## THE EDITORS

Damon Knight's achievements span the entire field of Science Fiction: author, magazine and book editor, critic, reviewer, anthologist. Among his dozens of anthologies is the *Orbit* series, which has contributed a remarkable number of award-winning stories. He was the founder and first president of Science Fiction Writers of America.

Lloyd Biggle, Jr. is the author of nine Science Fiction novels, including the forthcoming *This Darkening Universe.* His numerous short stories have appeared in all the Science Fiction magazines, as well as in two book collections. He is the editor of *Nebula Award Stories Seven,* an anthology.

\* \* \*

Marshall Tymn is a well-known bibliographer of Science Fiction and the editor of the forthcoming *Checklist of Fantastic Literature,* the multivolume *Guide to Fantastic Literature,* and *The Science Fiction Reference Book.* He reviews Science Fiction for *Choice Magazine* and teaches courses in Science Fiction at Eastern Michigan University.

*for further information on* THE SCIENCE FICTION UNIVERSE *write to*

Perennial Library, Harper & Row, Publishers, Department 524

10 East 53d Street, New York, New York 10022