The **HORN & HARDART COMPANY**, Plaintiff,

v.

The **PILLSBURY COMPANY**, Defendant.

No. 85 Civ. 5463 (WK).

United States District Court, S.D. New York.

Jan. 13, 1989.

Ronald S. Rauchberg, James F. Parver, Bradley I. Ruskin, Linda S. Gorby, Pros-kauer, Rose, Goetz & Mendelsohn, New York City, for plaintiff.

Stuart L. Shapiro, Peter E. Greene, Cornelius J. Grealy, David G. Cohen, Skadden, Arps, Slate, Meagher & Flom, New York City, for defendant.

## MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

This has been a complex and bitterly contested litigation between The Horn & Hardart Company and The Pillsbury Company, who, if this court's experience is any guide, spend most of their time and energy litigating with each other. Pillsbury, the defendant in the instant action, seeks to dispose of it by motion for summary judgment. For reasons that follow, we grant the motion and dismiss the action on the ground that the alleged oral contract upon which this lawsuit is based is unenforceable under the Statute of Frauds. We thus do not reach the other contention advanced by Pillsbury in its motion, namely, that Horn & Hardart had materially breached the alleged agreement, thereby discharging any obligation on Pillsbury's part.

### FACTS

For the purpose of this motion we assume the following facts to have been established. On and before May 14, 1985, Horn and Hardart and Pillsbury had been engaged in complicated maneuvers by which each was seeking ultimate acquisition of a concern known as Diversifoods, Inc. On that day, each acting through authorized agents, Horn & Hardart and Pillsbury entered into an oral agreement whereby the former agreed to desist from any further efforts to acquire Diversifoods, and the latter promised that should it succeed in its continued efforts it would immediately sell to Horn & Hardart certain of Diversifoods assets at their "net tangible book value." Pillsbury undertook to offer at least $11.50 per share for Diversifoods. Although the parties contemplated memorializing their agreement in writing, they both intended to be bound by the oral understanding. John Creed, Diversifoods' president, was informed of the agreement

by both Jerry Levin, Pillsbury's Executive Vice President and Donald Schupak, Horn & Hardart's Vice Chairman.

On the following day, May 15, after learning of a possible delay in obtaining a draft of the agreement from Pillsbury's counsel, Schupak telephoned Creed and discussed with him an offer for Diversifoods that Horn & Hardart would be willing to make if its agreement with Pillsbury broke down. He informed Creed that Horn & Hardart might be able to make an offer of $12 per share, comprised of cash and either Horn & Hardart stock or other securities. On the same day, Logan Delany of Drexel Burnham Lambert, Horn & Hardart's investment banker, met with Richard Sapp of Goldman Sachs, Diversifoods' investment banker, and discussed a proposal for a $12 per share, part-cash, part-stock, acquisition of Diversifoods in the event of a breakdown in the agreement between Horn & Hardart and Pillsbury.

On the evening of May 15, after learning of and confronting Schupak with regard to these communications, Pillsbury repudiated the agreement. Immediately thereafter, Schupak again telephoned Creed and actually made the offer that had been discussed earlier in the day, which offer was orally confirmed the following day by Barry Florescue, Horn & Hardart's Chairman of the Board and Chief Executive Officer.

On May 17, Pillsbury and Diversifoods executed a merger agreement for $11.50 per share, all cash. The merger was approved by the Diversifoods board on May 20, in the face of Horn & Hardart's vigorously advanced competing offer of $12 per share (still part-cash, part-stock, with various contingencies). Horn & Hardart commenced litigation in the District of Nebraska alleging breach of fiduciary duty and seeking to enjoin the Pillsbury–Diversifoods merger.[1] After extensive litigation, Pillsbury went on to consummate its acquisition of Diversifoods, but refused to honor its earlier agreement to sell the designated assets to Horn and Hardart. This suit seeks specific performance of that agreement or, in the alternative, damages in the amount of $69,000,000.

## DISCUSSION

### A. *The Statute of Frauds:*

■ The parties agree that the oral agreement alleged by plaintiff is one which, under New York Law, is within the Statute of Frauds, either under N.Y.U.C.C. § 1–206(1) as a contract for the sale of personal property valued in excess of $5000, or under N.Y.U.C.C. § 8–319 as a contract for the sale of securities. Section 1–206(1) conditions enforceability of a contract on the existence of a "writing which indicates that a contract for sale has been made between the parties at a defined or stated price, reasonably identifies the subject matter, and is signed by the party against whom enforcement is sought or by his authorized agent." Section 8–319 tracks this language, but instead of requiring "reasonably identifie[d] ... subject matter," requires that the writing refer to "described securities." We hold that of the two statutes, § 1–206(1) is the more appropriate, the alleged contract being essentially one for the sale of a business (or a portion thereof). *Olympic Junior, Inc. v. David Crystal, Inc.* (3rd Cir.1972) 463 F.2d 1141, 1144–45 (applying New York law).[2]

■ Horn & Hardart has offered a series of signed and unsigned "writings" which, it contends, satisfy the Statute of Frauds when read together. The circumstances in which such a combination of

1. *Jesart Partners v. Diversifoods, Inc. et al.,* No. CV 85–0–576 (D.Neb). A temporary restraining order was issued in this action on June 13, 1985. A hearing on a motion for a preliminary injunction was held on June 18, 1985. We shall herein cite testimony from that hearing, referring to it as the "Jesart hearing." The papers submitted on the present motion do not disclose either the current status or any ultimate disposition of the *Jesart* action.

2. Pillsbury's counsel referred in a footnote to other Statute of Frauds provisions, including N.Y. U.C.C. § 2–201, which covers contracts for the sale of goods and contains significantly more permissive language than the above described provisions. Since the transaction here in question cannot reasonably be viewed as a "sale of goods," we have ignored all discussion of the caselaw in subsequent briefs that this citation invited.

signed and unsigned writings may be deemed to satisfy the Statute are defined in Judge Fuld's opinion in *Crabtree v. Elizabeth Arden Sales Corp.* (1953) 305 N.Y. 48, 110 N.E.2d 551. As we shall demonstrate, the fatal flaw in Horn & Hardart's effort to satisfy the Statute is that the sole signed document does not meet the standards specified in *Crabtree* as a prerequisite to any "reading together" with the offered unsigned documents.[3]

In *Crabtree*, the Court—after an extensive review of cases in other jurisdictions and of some apparently conflicting decisions of its own—rejected the strict standard that the signed writing must specifically refer to the unsigned writings, and established as the law of New York that "signed and unsigned writings [may be] read together, *provided they clearly refer to the same subject matter or transaction.*" 305 N.Y. at 55, 110 N.E.2d 551 (emphasis added). Elaborating on the language we have italicized, the Court went on to state:

> [A]t least one writing, the one establishing a contractual relationship between the parties, must bear the signature of the party to be charged, while any unsigned document must on its face refer to the same transaction *as that set forth* in the one that is signed.

*Id.* at 56, 110 N.E.2d 551 (emphasis added). Thus the *signed* writing or writings must not only "establish a contractual relationship" but must also "set forth" the transaction with which the contract is concerned. Put another way, the signed writing must "set forth" *some* transaction or subject matter before any unsigned writing may be said "on its face [to] refer to the *same* transaction."

Among the writings offered by Horn & Hardart, the only one that is signed is a letter dated May 17, 1985 from John Stafford, Pillsbury's president, to a member of its Board of Directors, referring to an upcoming special meeting of the Board (hereinafter the "Stafford letter"). So far as here relevant, that letter states:

> Since our May 7 Board Meeting, a great deal has occurred: Following your suggestion, we initiated negotiations with Horn & Hardart. Early discussions were positive, but almost immediately they violated our verbal agreement and we broke off discussions.[4]

Exhibit 1 to Affidavit of Ronald Rauchberg.

There are two fatal defects in Horn & Hardart's reliance on this document. First, although Horn & Hardart has trumpeted the phrase "our verbal agreement" as if it had some sort of talismanic significance, we do not agree that it alone suffices to "establish a contractual relationship." Indeed, when the phrase "our verbal agreement" is read in the context of the entire sentence, it would appear that Stafford was not referring to any ultimate agreement between the parties, but instead to certain ground rules that they had adopted to govern their conduct during their continuing "discussions," which ground rules were violated "almost immediately" after discussions had commenced (i.e. before there had been an opportunity to arrive at a contract). While such a violation might justify termination of the "discussions," it could not give rise to a cause of action for breach of contract.[5] It follows that such a "verbal agreement" does not rise to the level of a "contractual relationship."

3. Horn & Hardart has offered a number of unsigned writings, which are unnecessary to discuss in detail due to the threshold defects in the sole signed writing.

4. This quotation contains all of the language to which reference is made in either party's memoranda.

5. For example, if two business associates should verbally agree to have lunch at a given time and place to discuss a business transaction, and one of them should fail to show up, the other would probably be disappointed but would hardly have a cause of action. The circumstance that this opinion proceeds, *arguendo,* on the assumption that the verbal agreement actually arrived at constituted a fully completed contract (*see* pages 1063–1064, *supra* ) and that Pillsbury has made a similar *arguendo* concession (*see* Memorandum of Law at 4) does not—for Statute of Fraud purposes—invest Stafford's reference to a "verbal agreement" with content that it otherwise lacks.

The second flaw is that even assuming *arguendo* that Stafford's reference to a "verbal agreement" had "establish[ed] a contractual relationship between the parties," there is nothing in the Stafford letter which gives any inkling as to the transaction or transactions that were the subject of the "negotiations" claimed to have resulted in an "agreement." The Stafford letter can in no way be said to "set forth" a transaction in a manner that would allow linkage with any unsigned writing. It therefore does not provide a basis for satisfying the Statute of Frauds under New York law as defined in *Crabtree*.

Although it is not contended that the New York Court of Appeals has ever reconsidered or modified its ruling in *Crabtree*, Horn & Hardart has cited a plethora of lower court and federal cases with the apparent intention of suggesting that the Court would now reconsider and water down its requirements in such a way as to permit the Statute to be satisfied by writings such as those at bar. In considering whether the cases cited support that suggestion, we shall heed the admonition of the New York Court of Appeals (given in another context) that "[t]he marshaling of phrases plucked from various opinions and references to generalizations, with which no one disagrees" is usually of no great value, and that "[w]e must keep in mind that 'opinions must be read in the setting of the particular cases and as the product of preoccupation with their special facts.'" *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 322, 184 N.Y.S.2d 599, 603, 157 N.E.2d 597 (citation omitted). Examining with these principles in mind all relevant [6] post-*Crabtree* cases cited by Horn & Hardart, we find that—with three possible exceptions which we discuss separately—the signed writings in all of them substantially met the standards laid down by Judge Fuld, and thus none of them gave any court occasion to consider whether or not those standards should be at all relaxed.

We discuss the cases in chronological order:

In *Papaioannou v. Britz* (1st Dep't 1955) 285 A.D. 596, 139 N.Y.S.2d 658, the plaintiff had written numerous letters to the defendant, his brother-in-law, describing in detail the defendant's alleged promises to provide plaintiff with substantial amounts of money in exchange for plaintiff's agreement to marry the defendant's sister. In reply to these letters, defendant wrote: "unfortunately, I was not in a position to keep my promise about your money," and made several other references to "my promises." 139 N.Y.S.2d at 661. The Appellate Division, holding the statute to be satisfied, noted: "The references to promises in the defendant brother's letters are prima facie admissions of the specific promises recited in the brother-in-law's letters. There are no other promises referred to in the letters in question." *Id.* at 662.

In *Babdo Sales, Inc. v. Miller–Wohl Co.* (2nd Cir.1971) 440 F.2d 962, the Statute of Frauds was held to be satisfied by the combined reading of unsigned memoranda together with a signed letter stating:

In accordance with our agreement we are terminating your existing lease in the Welles Stores as of February 28, 1969 in order to initiate the new leases as of March 1, 1969.

*Id.* at 964 n. 2.

In *La Londe v. Modern Album & Finishing* (2d Dep't 1972) 38 A.D.2d 960, 331 N.Y.S.2d 889, *aff'd on opinion below* (1974) 35 N.Y.2d 804, 362 N.Y.S.2d 460, 321 N.E.2d 551, a letter signed by defendant's president included "all of the material terms of the oral [employment] agreement, save one, the commencement date," which date was established "with reasonable certainty" in various other documents clearly related to plaintiff's employment. 331 N.Y.S.2d at 891.

*Weitnauer Trading Company v. Annis* (2d Cir.1975) 516 F.2d 878, was a suit on a guarantee to which specific reference was made in numerous letters passing between the parties, including one from defendant

6. We have omitted from our discussion all pre-*Crabtree* cases, cases construing U.C.C. § 2–201, and any case not concerned with application of the *Crabtree* principles to multiple (signed and unsigned) writings.

which acknowledged plaintiff's letter and specifically stated that "this guarantee was agreed to by three parties, Mr. Kassin, Mr. Fellman and myself", and that "any amount over $100,000 was jointly guaranteed by the three individuals." *Id.* at 880.

In *Manhattan Fuel Co., Inc. v. New England Petroleum Corp.* (S.D.N.Y.1976) 422 F.Supp. 797, a fuel broker sued to recover brokerage commissions. The writings consisted of an exchange of four letters between the parties, in which:

> Even if [plaintiff's] replies ... were to be ignored, [defendant's] letters alone indicate[d] an agreement to retain [plaintiff] as a broker to obtain Niagara Mohawk's business for defendant, and to pay a commission of five cents a barrel of oil delivered to Niagara Mohawk for the term of the contract between buyer and seller so solicited.

*Id.* at 800.

In *Great Destinations Inc. v. Transports Aereos Portugeses S.A.R.L.* (S.D.N.Y.1978) 460 F.Supp. 1160, plaintiff, a tour operator, claimed that the defendant airline had breached a contract to provide two series of chartered flights. Judge Sweet held the Statute of Frauds to be satisfied by a series of writings which included two letters signed by an employee of defendant confirming the availability of the defendant's aircraft for each of the series of flights. *Id.* at 1162–4.

In *Ahouse v. Herbert* (3d Dep't 1980) 78 A.D.2d 713, 432 N.Y.S.2d 274, the question was whether one of the parties had agreed to retain $25,050 of certain mortgage money and pay it to Marine Midland Bank. A memorandum signed by an employee of that party provided:

> The $25,050 remaining balance due Mr. Ahouse was assigned to Marine Midland Bank–Southern on July 13, 1973 by Mr. Ahouse. Therefore, we cannot allow Mr. Herbert to complete the remaining items and deduct the amount from the $25,050, unless Marine Midland is willing to release the assignment.

432 N.Y.S.2d at 276.

In *Reprosystem, B.V. v. SCM Corp.* (S.D.N.Y.1981) 522 F.Supp 1257, 1277–78,

*rev'd on other grounds* 727 F.2d 257, *cert.* *denied* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed. 2d 54 the defendant did not "seriously dispute" the Statute of Frauds point, 522 F.Supp. at 1277, so Judge Sweet's opinion does not identify the numerous documents upon which he relied to find the Statute satisfied. *See id.* at 1278.

*Biggle v. Harper & Row Publishing, Inc.* (6th Cir.1982) 675 F.2d 107 (applying New York law), involved an alleged contract to publish an anthology, where the dispute centered around the number of volumes that were to have comprised the anthology. There were numerous *signed* documents which "[t]aken together ... establish that there was a contractual relationship between the parties, that it involved the publication of an anthology to be known as "Science Fiction Universe," to consist of several volumes...." *Id.* at 111. An unsigned inter-office memorandum circulated within the defendant company "identified the 'Science Fiction Project' and contained the statement that Van Dusen had talked with [plaintiff] and 'agreed to do the 8 books.'" *Id.*

The first of the three possibly exceptional cases to which we referred above is *APS Food Systems, Inc v. Ward Foods, Inc.* (1st Dep't 1979) 70 A.D.2d 483, 421 N.Y.S. 2d 223. It involved the question whether or not the Statute was satisfied by a letter signed by defendant's president referring to "the deal as set up Saturday," when read together with other unsigned writings. However, the Appellate Division did not, as Horn & Hardart suggests, *see* Memorandum in Opposition at 50, hold that the writings before it satisfied the Statute of Frauds. On the contrary, the court specifically observed that it did not "now decide that these items established a contract," but simply held that plaintiff should be allowed discovery to see if it could unearth additional evidence (perhaps including other signed documents) to make out a case. 421 N.Y.S.2d at 226. By contrast, the instant motion was made after more than two years of extensive discovery.

The other two possible exceptions are each cases in which the only writing bear-

ing the defendant's signature was a check sent by one party to another that did not itself identify the underlying transaction, but which was nonetheless held to satisfy the Statute of Frauds in combination with other unsigned writings. In *Schubert v. Bowman* (Sup.Ct. Suffolk Co.1957) 9 Misc. 2d 111, 167 N.Y.S.2d 451, an action seeking specific performance of an alleged contract for the sale of real property, the check written by the plaintiff for a down payment was indorsed and deposited by the defendant. A "letter of defendant's broker *accompanying the check* [apparently a transmittal letter] set[ ] forth the terms of the transaction with clarity." 167 N.Y.S.2d at 452 (emphasis supplied). In *Hernandez v. Bantam Books* (Sup.Ct.N.Y.Co.1987) N.Y. L.J., 8/4/87, p. 6, col. 6, a $5000 check made out by defendant in plaintiff's favor was accompanied by an invoice dated 10 days prior to the date of the check, which "indicates that [plaintiff] is being paid $5000 for a 'consultant fee re: Iacocca'." *Id.* In neither of these opinions did the court explain its reasoning in finding the check to be adequate as signed writing under the *Crabtree* standards. It is likely that each was influenced by the almost universal practice of interpreting checks by reference to accompanying invoices or transmittal letters. No such considerations are here involved, and, as in *APS Food Systems, supra,* there is nothing in these lower court opinions from which we can conclude that the New York Court of Appeals would be influenced by them in any way relax to the standards enunciated in *Crabtree.*

In sum, Horn & Hardart has been unable to cite a single post-*Crabtree* decision which finds the requirements so carefully specified in Judge Fuld's opinion to have been met in any factual situation even remotely analogous to the case at bar, or which suggests any qualification of those requirements.

**B.** *Equitable Exceptions to the Statute of Frauds:*

Horn & Hardart argues, in the alternative, that even assuming the absence of a writing or writings satisfying the Statute, the equitable doctrines of estoppel and part performance preclude its invocation as a defense. Although the parties have separately discussed the principles of equitable estoppel, promissory estoppel and part performance, all of these doctrines share the requirement that the plaintiff show some "unconscionable," or at least "substantial," injury incurred through its actions (or inaction) in reliance on the alleged oral promise. *American Bartenders School, Inc.* (1983) 59 N.Y.2d 716, 463 N.Y.S.2d 424, 450 N.E. 2d 230 (equitable estoppel exists "to prevent the infliction of unconscionable injury"); *Philo Smith & Co., Inc. v. USLIFE Corporation* (2nd Cir.1977) 554 F.2d 34, 36 ("doctrine of promissory estoppel is properly reserved for that limited class of cases where 'the circumstances are such as to render it *unconscionable* to deny' the promise upon which plaintiff has relied," and requires "substantial injury" (*quoting* Williston on Contracts § 533A, at 801 (3d ed.1960) (emphasis the court's)); [7] *United Air Lines, Inc. v. Austin Travel Corp.* (S.D.N.Y.1988) 681 F.Supp. 176, 191 (doctrine of part performance requires "substantial injury" (*quoting Marcraft Recreation Corp v. Francis Devlin Co.* (S.D.N.Y. 1981) 506 F.Supp. 1081, 1085)).

In attempting to defeat Pillsbury's motion for summary judgment by demonstrating the existence of a material issue of fact with respect to its endurance of such injury, Horn & Hardart has the burden of presenting sufficient evidence to warrant the submission of this issue to the trier of fact. *Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242, 250–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202. Horn & Hardart has failed to meet its burden of providing a factual issue which could be submitted to a jury.

*Montgomery Ward & Co., Inc.* (2nd Cir 1986) 804 F.2d 787, 793, *quoting* Restatement (Second) of Contracts § 90 (promissory estoppel requires "an injury sustained ... by reason of ... reliance").

---

**7.** *But see E.F.S. Ventures Corp. v. Foster* (1988) 71 N.Y.2d 359, 368–69, 526 N.Y.S.2d 56, 61, 520 N.E.2d 1345, 1350 (doctrine of equitable estoppel applies if party "changes position to his injury"); *Esquire Radio & Electronics, Inc. v.*

As an initial matter, we note that Horn & Hardart has described in different ways the injury it claims to have suffered through its reliance or through its part performance. In its original Memorandum in Opposition, it stated (at 53):

Horn & Hardart relied on Pillsbury's promises and assurances, as Pillsbury intended, by halting its efforts to acquire Diversifoods during a crucial period in the bidding process and by telling Diversifoods about its deal with Pillsbury. As a result, Horn & Hardart lost its momentum and lost its credibility as a serious suitor for the entire company.

In its post-argument submission, responding to Pillsbury's argument that Horn & Hardart suffered no injury because the latter actually did compete for Diversifoods, albeit unsuccessfully, it stated:

This argument is based on events occurring *after* Pillsbury and Diversifoods signed the definitive agreement pursuant to which Pillsbury acquired Diversifoods for $11.50 per share.... Once Pillsbury contracted to buy Diversifoods at that very price, Horn & Hardart no longer had the opportunity to buy the company at that price. It then only had an opportunity if it could outbid Pillsbury....

Horn & Hardart's principal injury is its loss of the opportunity to buy Diversifoods for $11.50 per share. Thus, for example, if Pillsbury is right ... that Horn & Hardart was unable to finance a $12 bid for Diversifoods, that only serves to underscore the fact that Horn & Hardart was injured when it lost the opportunity to acquire Diversifoods for $11.50 per share.

Letter of Ronald Rauchberg dated August 25, 1988 at 7. Later in the same letter, counsel reiterated the "loss of credibility" claim, and concluded by stating: "Horn & Hardart has presented evidence that would enable a jury to find that as a result of Horn & Hardart's reliance on Pillsbury's promises Horn & Hardart lost the opportunity to compete with Pillsbury to acquire Diversifoods." *Id.*, at 10–11.

Before discussing each of these theories of injury, we observe that the courts have been exceedingly reluctant to find sufficient "unconscionability" to preclude a Statute of Frauds defense in "the mere failure to seek an uncertain prospective benefit." *Philo Smith, supra,* at 36; *Country–Wide Leasing Corp. v. Subaru of America, Inc.* (2nd Dep't 1987) 133 A.D. 2d 735, 520 N.Y.S.2d 24, 25, *appeal denied* (1988) 70 N.Y.2d 615, 526 N.Y.S.2d 436, 521 N.E.2d 443. Horn & Hardart's theories of loss of "momentum" or "credibility as a suitor," loss of the "opportunity to acquire Diversifoods for $11.50 per share," and the "loss of opportunity to compete," can all be fairly placed in this category of unacceptable "injury." Quite apart from this deficiency, however, each of these theories is baseless.

Turning first to the claim that the "principal injury" suffered was the "loss of the opportunity to buy Diversifoods for $11.50 per share," we find two glaring defects in this argument. First, Horn & Hardart has not presented any evidence that it had the financial wherewithal to meet Pillsbury's $11.50 per share cash offer. At no time did it obtain from Drexel Burnham, its investment banker (and the only source of financing that has been identified), written confirmation that the latter was "highly confident" of obtaining financing. Horn & Hardart has presented statements from several witnesses, based on hearsay, to the effect that Drexel had indicated willingness to back an acquisition of Diversifoods. However, Logan Delaney, the only Drexel witness whose testimony has been cited, was far from certain on this point:

A. Drexel did not tell Horn & Hardart that it would not give it a highly confident letter. What it said was that before we can give you one, we have to agree on the form of the transaction, the terms, et cetera. We had to go through various procedures in order to give you that letter, and we had never gotten to the point where we had everything together to go through the procedure to give Horn & Hardart the letter.

Q. Did Drexel ever go through those procedures to get to the point ...

[w]here it was prepared to give a highly confident letter?

A. No.

\* \* \* \* \* \*

Q. Did you ever tell them that you were prepared to sign an underwriting agreement?

A. No. What we told them, we had discussed a number of structures and we told them what the corporate finance team was prepared to do or what Horn & Hardart would have to do before the corporate finance team was prepared to recommend to the underwriters assistance committee and the commitment committees that we back them.

\* \* \* \* \* \*

Q. Did Horn & Hardart ever agree to do any of those things that they were told they would have to do before corporate finance would back them?

\* \* \* \* \* \*

A. There were within the package of alternatives that we at Drexel were prepared to back or the corporate finance team was prepared to back Horn & Hardart, there were alternatives there which Horn & Hardart was prepared to go ahead and do, but it was a question of negotiating the various elements of those packages.

Q. Did any of those packages ever get negotiated, those elements?

A. Not to the point where we could say Plan C is the one that we are going ahead with.

Delaney Deposition at 37, 82–83. This is hardly the sort of testimony on which we could submit to a jury the question of whether or not Horn & Hardart actually had the financial backing to achieve an acquisition at $11.50 per share, which would be a prerequisite to any finding that it had been injured in losing the opportunity to do so.

A second defect in Horn & Hardart's argument that it lost its $11.50 per share opportunity on May *17* when Pillsbury and Diversifoods contracted for a merger at that price is that it ignores the fact that Horn & Hardart itself had already scuttled that opportunity on May *15* by discussing, and then making, a *$12.00* per share offer.

■ As to the more metaphysical of the injury claims, no jury could reasonably find that Horn & Hardart irretrievably lost its "momentum" and "credibility as a serious suitor" by informing Diversifoods of the standstill agreement and then forbearing from its efforts to acquire the company for a period of barely 24 hours spanning May 14 to 15. Regardless of whether Schupak's fateful telephone call to Creed on the afternoon of May 15 constituted a material breach of the agreement between the parties (a proposition which Pillsbury urges and which we do not consider on this motion), there can be no doubt that it at least served the purposes of keeping communications open between Horn & Hardart and Diversifoods and of keeping alive Horn & Hardart's chances of acquiring Diversifoods. The very purpose of the call was to preserve "momentum" and "credibility." Similarly, even if the discussions that took place on May 15 between investment bankers for Horn & Hardart and Diversifoods did not constitute a material breach of the standstill agreement, they were obviously undertaken to preserve Horn & Hardart's "momentum" and "credibility."

Moreover, all of the witnesses associated with Diversifoods testified that the competing offer made by Horn & Hardart after the breakdown of its agreement with Pillsbury received careful scrutiny and was rejected for reasons having nothing to do with the standstill agreement. Creed, Diversifoods' president, advised the company's board of directors at their May 20, 1985 meeting that Horn & Hardart's contingent, part-cash part-stock offer "should be considered as a legitimate offer." Creed Deposition at 224. Thomas McMahon of Goldman Sachs, Diversifoods' investment banker, gave a detailed presentation to the Diversifoods board as to the comparative quality of the competing offers, and advised the board to accept Pillsbury's offer.[8] As he testified at the Jesart Hearing (at 92–94):

8. We agree with Horn & Hardart, *see* Rauchberg Letter of 8/25/88 at 9, that the minutes of

[W]e, Goldman Sachs, recommended that they take the Pillsbury offer for a number of reasons ... [T]here were a number of deficiencies in our view ... in the $12 proposal by Horn & Hardart which made it contrast unfavorably with the eleven-fifty cash offer from Pillsbury.... Number 1, the cash was not in place.... Drexel, according to Horn & Hardart, had represented that they were confident that they could raise the cash, but there was no documentation from Drexel certifying that or saying in writing that they did have the cash in hand.

Secondly, there were a number of outs in the proposals that had been discussed with us by the people at Horn & Hardart in the past which were not directly alluded to within their letter, but which could cause them to withdraw from the transaction.

Similarly, William Trotter, a Diversifoods director and its largest individual shareholder, testified at the Jesart Hearing (at 135–36):

When your looking at the two offers side by side and you have a strong, vested interest in analyzing those two offers, you realize that the $11.50 all cash offer is sitting right there on the table, in green and white, "In God We Trust," it's right there, no contingency, nothing— ... and analyzing the Horn & Hardart offer, on the surface it said $12.00, but once you really got looking at it, from the inside, you realize that ... it was not really an offer ... There was no commitment on the part of anybody to do anything—nothing. And in the absence of the Pillsbury offer, me, as a shareholder, I would have nothing.

Horn & Hardart has made much of Trotter's reference to Horn & Hardart, elsewhere in his *Jesart* Hearing testimony (at 58), as "Johnny-come latelys." However, an examination of the context of that comment makes clear that Trotter was referring to Horn & Hardart's delay in presenting a written offer to the Diversifoods board, and the resulting inability of Goldman Sachs to make a written presentation to the board concerning that offer. Horn & Hardart has presented no evidence suggesting that the Diversifoods board rejected its offer for any reason other than that it was simply less beneficial to Diversifoods' shareholders than Pillsbury's offer.

In sum, all of the foregoing should make clear that Horn & Hardart's claim that it "lost the opportunity to compete with Pillsbury to acquire Diversifoods" does not present a viable basis for a finding that it was actually prejudiced. Horn & Hardart has failed to produce evidence which would justify a finding of any injury, let alone "unconscionable" or "substantial" injury, which would warrant suspending the bar of the Statute of Frauds on any of the equitable theories it has advanced.

A further weakness in Horn & Hardart's theories of part performance and promissory estoppel arises from its failure to meet its burden of showing that its actions or forbearance on May 14 or 15 were "unequivocally referable" to the alleged oral agreement. *Anostario v. Vicinanzo* (1983) 59 N.Y.2d 662, 463 N.Y.S.2d 409, 450 N.E.2d 215 (part performance); *Long Island Pen Corp. v. Shatsky Metal Stamping Co., Inc.* (2d Dep't 1983) 94 A.D. 2d 788, 463 N.Y.S.2d 39, 40 (promissory estoppel).[9] As the New York Court of Appeals has recently observed:

It is not sufficient ... that the oral agreement gives significance to plaintiff's actions. Rather, the actions alone must be 'unintelligible or at least extraordinary', explainable only with reference to the oral agreement.

the meeting, prepared after litigation had already begun, are not the weightiest evidence of what actually transpired at the meeting, and thus we have relied exclusively on the sworn testimony of those in attendance at the meeting, which testimony has not been contradicted or seriously challenged.

**9.** There has been a dispute between the parties as to the applicability of the "unequivocally re-

ferable" requirement beyond the context of the doctrine of part performance. There appears to be support for its application to promissory estoppel, *see Long Island Pen Corp., supra; Ripples of Clearview v. Le Havre Associates* (2nd Dep't 1982) 88 A.D.2d 120, 452 N.Y.S.2d 447, 449, but not to the related doctrine of equitable estoppel. *See Margate Industries v. Samincorp. Inc.* (S.D.N.Y.1984) 582 F.Supp. 611, 619 n. 8.

*Anostario, supra,* 463 N.Y.S.2d at 410 (*quoting* Cardozo, J., in *Burns v. McCormick* (1922) 233 N.Y. 230, 232, 135 N.E. 273) (other citations omitted).

Horn & Hardart asserts that it partially performed by informing Diversifoods of the standstill agreement on May 14 and by refraining from all communications with Diversifoods until May 15. Pillsbury points to evidence tending to establish that the parties had orally agreed on May 14 to abide by an interim "mutual standstill" with respect to pursuing Diversifoods, during the pendency of their negotiations, in anticipation of an ultimate agreement whereby Horn & Hardart would unilaterally forbear from pursuing Diversifoods.[10] Whether or not an interim "mutual standstill" had been agreed upon is an obvious question of fact, but in this instance the existence of a question of fact supports, rather than precludes, summary judgment. The possibility of attributing Horn & Hardart's communication with Diversifoods on May 14, and its subsequent brief forbearance from further communications, to such a "mutual standstill," precludes a finding that such actions were "unequivocally" referable to the particular oral agreement it has alleged.

*C. The "Work Product" Doctrine:*

▪ We note, finally, that in the context of ruling on the instant motion we have revisited our earlier decision barring disclosure, pursuant to the "work-product" doctrine, of notes made on May 16, 1985 by Edward C. Stringer, Pillsbury's Executive Vice President and General Counsel.[11] Memorandum & Order of January 20, 1988 (adopting an order of Magistrate Tyler). We remain confident that the document was properly protected from disclosure. The "work product" doctrine was conceived precisely to encourage attorneys to make notes like those in question. In addition to protecting an attorney's private strategic thoughts as reflected in such notes, the

doctrine significantly reduces the fear that his or her client's interests might through disclosure at some later point be prejudiced in a manner not reasonably foreseeable at the time the notes were made. *See John Doe Corp. v. United States* (2nd Cir.1982) 675 F.2d 482, 492. *Cf. United States v. Paxson* (D.C.Cir.1988) 861 F.2d 730, 1988–2 Trade Cas. (CCH) ¶ 68,332 (subpoena of attorney's notes of client witness' prior interview with government attorneys properly quashed). Had the notes been ordered to be produced, and then been in some way employed by Horn & Hardart in its effort to rebut Pillsbury's Statute of Frauds defense, we are certain that Stringer and any other attorney learning of such a happening would long hesitate before again making a similar memorandum, with resulting erosion of conscientious representation of their clients.

### CONCLUSION

Defendant Pillsbury's motion for summary judgment is granted. The Clerk is directed to enter a judgment dismissing the complaint.

SO ORDERED.

---

**10.** The evidence to which Pillsbury refers includes Stafford's deposition testimony, in which he referred (at 141) to "our mutual standstill agreement," and Schupak's Jesart hearing testimony, in which he stated (at 135): "There was an agreement reached as to the kinds of communications that either side could have with Diversifoods."

**11.** Stringer's notes reflect what Levin had told him about the meetings between Pillsbury and Horn & Hardart on May 14 and 15.