**Adam LANDE, Plaintiff,**

v.

**RADIOLOGY SPECIALISTS OF KINGSTON P.C., Michael S. Komarow, Thomas Abraham Koshy, David Ryon and Komarow, Koshy, Lande & Ryon Equipment Company, Defendants.**

**No. 90 Civ. 1251 (JFK) (SEG).**

United States District Court, S.D. New York.

Sept. 17, 1992.

Marc A. Pergament, Weinberg, Kaley & Pergament, P.C., Garden City, N.Y., for plaintiff.

Michael S. Komarow and Thomas A. Koshy was Patrick M. Reilly, David Worby, P.C., White Plains, N.Y., for defendants Radiology Specialists of Kingston, P.C.

## OPINION

GRUBIN, United States Magistrate Judge:

This case, tried to the court without a jury, is brought by plaintiff Dr. Adam Lande against Dr. Michael S. Komarow and Dr. Thomas A. Koshy, his former colleagues in an incorporated medical practice at which he ceased working in 1987. Plaintiff claims that he is due certain sums from the defendants representing the value of his shares in the professional corporation and compensation which he was improperly denied in 1986 and 1987.

## FACTS

On January 1, 1986, Lande, the two defendant doctors and Dr. David Ryon[1] formed Radiology Specialists of Kingston, P.C., a professional corporation under New York State law. They executed a shareholders agreement (P.Ex. 7),[2] and each doctor executed an employment agreement with the corporation at that time. The group had been in practice as a partnership for about a year prior to that time and had previously formed a professional corporation in 1985 for the purchase of radiology equipment known as the Komarow, Koshy, Lande & Ryon Equipment Company. This Equipment Company retained no value of its own, and was set up to enable the doctors to pass through an investment tax credit on equipment to their personal individual returns, and a note of value equal to the equipment was taken out at the same time. Under the agreements as well as the

corporate by-laws, each doctor was an equal shareholder in both corporations, and they were to receive equal salary and other compensation.[3]

In mid–1986 it was determined that Lande was to find other employment and then leave the practice. He eventually found another position close to a year later, in July 1987, at Mount Sinai Hospital and told Komarow (who handled the matters relevant herein on behalf of all defendants) that he would leave the practice August 15, 1987. At that time they agreed he would receive payment of six weeks' salary representing "sabbatical leave" to which each doctor was entitled every five years under their employment agreements. Plaintiff also maintains they agreed to additional salary for untaken vacation and educational leave, although Komarow denies those items were discussed. The main issue in this case—what plaintiff was to receive for his share of the practice—was apparently not discussed at that time, and there were no further relevant discussions between plaintiff and defendants until after plaintiff left the practice and a meeting was held on November 11, 1987.[4]

Present at the November meeting were Lande, Komarow, Thomas Doerr, who had been the accountant for the practice (and the individual doctors) since its inception, and Glenn Sutherland, who was an accountant plaintiff had consulted and retained for the purpose of reviewing the corporation's financial statements and advising him as to what amount he should receive. Plaintiff had also consulted his own attorney who was not, however, present at the meeting. According to Lande, Komarow initially offered him about $30,000, although Komarow says he offered $54,000, and Lande proposed $85,000 or $80,000.[5]

---

**1.** Ryon was dismissed as a defendant herein on May 15, 1991 upon stipulation.

**2.** "P.Ex. ___" and "D.Ex. ___" denote exhibits admitted at trial.

**3.** The doctor who served as the chairman of the radiology department of Kingston Hospital was to receive $5,000 yearly compensation in excess of his colleagues. Komarow was chairman in 1986, and Koshy in 1987.

**4.** The shareholders agreement required that any shareholder who left the employment of the corporation sell his shares back to the corporation or remaining shareholders, and it set forth a formula for calculating the price for the shares in such a situation.

**5.** Lande's testimony on the precise figure he proposed was inconsistent. *See* trial transcript ("Tr.") at 31 and 87.

Komarow then proposed $60,000, and Komarow claims that at this meeting Lande accepted the offer of $60,000 to be paid in monthly installments over two years in full payment of everything owed. Lande, however, maintains that the meeting was only an "exploratory" bargaining session at which he agreed to nothing. Lande says that the meeting simply ended with Komarow's $60,000 offer on the table:

Q. What happened at the end of the meeting?

A. Well, this is it. We agreed, sort of, they were talking about $60,000 and this was the end of the meeting. Nothing else was discussed.

Q. Did you then leave the meeting at that point in time?

A. Yes.

\* \* \* \* \* \*

MAGISTRATE GRUBIN: Excuse me a moment. Dr. Komarow offered you $60,000?

THE WITNESS: Yes.

MAGISTRATE GRUBIN: What did you say to that?

THE WITNESS: I didn't say anything. I just would take it as an offer of $60,000. I wanted to get more money, but he wouldn't budge above $60,000.

MAGISTRATE GRUBIN: How do you know?

THE WITNESS: Well, I repeatedly was talking about it.

MAGISTRATE GRUBIN: So you did talk to him after the meeting?

THE WITNESS: No, no during the meeting.

MAGISTRATE GRUBIN: After he made the $60,000 offer?

THE WITNESS: I never spoke to him.

MAGISTRATE GRUBIN: You just said thank you and left the meeting?

THE WITNESS: Yes. I never spoke to him later on. I mean, I never did speak to him.

Tr. at 33–34. There were no further discussions between the parties except that, sometime in late November or December, plaintiff called Komarow and asked, because he was short of money, if he could receive an "advance" payment of $8,000 by the end of the year. Komarow agreed and sent Lande two checks totaling $8,000. The checks were annotated on their face with the words "Payout" and "Stock Repurchase."

On February 2, 1988 Komarow sent Lande a letter that read as follows:

Adam,

Enclosed is a payment schedule for your pay-out. Please note the calculations.
1– $52,000 was the original total due
2– 2 payments totalling $8,000 12/31/87
3– 24 equal principal payments of $1833.33 (except pmt 24 of $1833.41)
4– 24 interest payments calculated as follows:
7.5% ÷ 12 = 0.625% interest monthly on the unpaid balance.
for example:
unpaid bal. = 44,000 × 0.625% = interest pmt of $275.00.
5– Total payment equals totals of 3 & 4 above.

This is as fair a calculation as I can think of. I hope this answers any questions you have.

[Michael]

D. Ex. 3. Included with the letter was a document entitled "ADAM–PAYMENT–SCHEDULE" which showed that Lande had been given $8,000 in December 1987, reducing the "balance due" to $44,000. Then, for each month for 24 months, commencing with February 1, 1988, the document set forth a payment amount, broken down into principal and interest, and the balance that would be due after each payment. The schedule showed the total paid after the last installment on January 1, 1990 would be $52,000 plus $3,300 in interest. Also included with the letter and schedule was a check to Lande dated February 1, 1988 representing the first payment. The check was annotated "Memo: STOCK REPURCHASE."

Although Lande initially testified that upon receipt of these documents he did not call Komarow, he later stated that he "apparently must have called him in February" because he recalls asking Komarow why the total was $52,000 instead of $60,000. Tr. 48. He testified that the $52,000 figure was "a shock" to him: "Instead of

$60,000, I received $52,000." Tr. 43.[6] Komarow's explanation was that it represented repayment of an outstanding $8,000 loan Lande had from the Equipment Company. (The exact amount of the loan was $8,716.) Lande also recalls that he told Komarow that interest rates were running higher than 7.5%, but Komarow said "this is it. He is willing to give me 7.5. I couldn't argue very much." Tr. 44.

What is significant about Lande's testimony is that he never questioned Komarow's clear assertion by way of these documents that $60,000 was the full payment Lande was to receive. Despite Lande's claim that he did not agree at the November meeting to this amount, upon receipt of the letter, schedule and check, his expressed concerns were about the interest rate and the $8,000 deduction. His "shock" was not at the $60,000 figure, but rather that he would receive only $52,000 *instead of* $60,000. He did not point out to Komarow that he did not agree to $60,000, nor did he set up any further meeting or make any additional proposal to Komarow—ever. To the contrary, he endorsed and deposited the February check. Each month thereafter through October 1988 Komarow sent a check in accordance with the schedule, and Lande endorsed and deposited each one without protest and without ever speaking to Komarow again or attempting to set up any meeting or negotiations. Each of the checks through September (except the July and August ones) was annotated "PAYOUT." [7] The checks for April, June and September also included the notation "bal" followed by the balance due pursuant to the schedule. In addition, the March check came accompanied by a memorandum from Komarow showing the "PAYOUT" for that month in terms of principal and interest, how he had calculated the interest portion and the "current balance" of $40,333.34. The August check was annotated with a breakdown for principal and interest, and a "bal. remaining 30,032.56." The September check,

which was sent September 13 rather than at the beginning of the month, was accompanied by a note from Komarow apologizing for the delay and explaining that he had added interest for the additional two weeks' delay, setting forth separately the amounts that represented principal and interest and showing "Balance $28,157.23." D. Exs. 1, 3, 4, 6.

In August 1988 Lande met with his accountant Sutherland because he "felt very uncomfortable about the tax consequences of this entire arrangement" since he did not trust the figures in the financial statements he had been given close to a year earlier and was afraid of his personal exposure in the event of an IRS audit. Tr. 49. There is no evidence as to why he was first prompted to address this concern at that time. Sutherland told Lande that in order to assess the situation precisely, he would have to make an audit of the corporation's records. Apparently Lande took no further steps in this regard. According to Lande, on October 14, 1988 he received a formal stock repurchase agreement drafted by the corporation's attorney. He then "notified" Komarow (apparently by phoning the corporation's lawyer) that he was not going to sign it because the agreement said that he would be liable for one-fourth of any money that might be due if there were ever an IRS audit. The evidence on this series of events is very unclear. No proposed written agreement was ever produced by either party, and the defendants seem to deny that such an agreement was sent at that time. Komarow, however, did testify that he learned from the corporation's attorney that Lande "was objecting to the terms of the agreement that we had reached." Tr. 228. On the attorney's advice, Komarow ceased further payments to Lande. It thus appears that something happened in October 1988 to cause Lande to contact the corporation's lawyer and cause that lawyer to advise Komarow to stop the payments. Lande's testimony that

---

**6.** See also Tr. 47: "I guess I must have spoken to him because I had to find out why it is $52,000 instead of $60,000."

**7.** The October check, drawn on a money market account which did not return cancelled checks, was not submitted, so we do not know what annotations, if any, were contained thereon.

he received at that time an agreement to sign appears logical. However, what is significant, again, is that Lande's expressed concern was with respect to his potential tax liability, not with respect to the amount of his buyout. His testimony as to why he would not sign the agreement related only to his tax concern.

## CONCLUSIONS OF LAW

■ The defendants have not met their burden of proving that an agreement was reached at the meeting of November 11, 1987. While Komarow testified Lande had indicated to him, out of the hearing of Doerr and Sutherland, his acceptance of the $60,000 offer at the end of the meeting, precisely what occurred is unclear. (I suspect, from watching Lande during his testimony and hearing his style of discourse, that when Komarow turned to him as the meeting was breaking up and asked if he assented, Lande responded with something akin to a shrug.) I do believe that Komarow thought they had an agreement. If he did have any doubt at the end of the meeting, however, it must have been dispelled by Lande's phone call shortly thereafter in which Lande asked that he be given $8,000 before the close of 1987 and never said anything more about the $60,000 proposal. Only if Komarow believed they had an agreement would his conduct thereafter, in paying the $8,000 and in drawing up a complete payment schedule and sending it to Lande with the first installment payment on February 2, 1988, have been rational.

■ While I find Lande's acceptance of Komarow's $60,000 offer has not been shown to have occurred at the November meeting, I nevertheless find that his conduct subsequent to his receipt of Komarow's letter, payment schedule and the first installment check in February did create a contract. Whether we view the $60,000 offer made at the meeting as one still outstanding in February, or we view the let-

ter, payment schedule and check as a renewed offer, Lande's acceptance, endorsement and negotiation of the check, and each monthly check thereafter, without protest or reservation,[8] established his assent to the deal. The documents sent by Komarow and Lande's acceptance of them thus operated as an accord and satisfaction, discharging all Lande's claims to monies beyond those set forth in the payment schedule. *Horn Waterproofing Corp. v. Bushwick Iron & Steel Co., Inc.,* 66 N.Y.2d 321, 497 N.Y.S.2d 310, 488 N.E.2d 56 (1985); *Gimby v. Frost,* 84 A.D.2d 806, 444 N.Y.S.2d 143 (2d Dep't 1981); *Horan v. Trommer,* 15 Misc.2d 347, 350–51, 137 N.Y.S.2d 26, 30 (Sup.Ct.N.Y.Co.1954); *Festa v. Leshin,* 132 Misc.2d 804, 505 N.Y.S.2d 538 (N.Y.C.Civil Ct.1986), *mod. on other grounds,* 138 Misc.2d 399, 528 N.Y.S.2d 261 (1st Dep't 1988). As recently stated by the First Department:

> The acceptance of a check in full settlement of a disputed unliquidated claim without reservation operates as an accord and satisfaction discharging the claim since the theory underlying the common law rule of accord and satisfaction is that the parties have entered into a new contract discharging all or part of their obligations under the original contract.

*Complete Messenger & Trucking Corp. v. Merrill Lynch Money Markets, Inc.,* 169 A.D.2d 609, 610, 565 N.Y.S.2d 794, 795 (1st Dep't 1991). While an essential element of an accord and satisfaction is that the offeror clearly manifest his intent that the tender will represent full satisfaction of the claim, that element was met here. The letter and payment schedule could leave no doubt that $52,000 was to be the total paid in full satisfaction, nor could Komarow's subsequent correspondence and monthly checks with their various annotations. All the material terms of the agreement are evident from the February documents: the total payout, the term of the payout, the

---

**8.** Section 1–207 of the New York Uniform Commercial Code (McKinney 1964) provides as follows:

A party who with explicit reservation of rights performs or promises performance or

assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved. Such words as "without prejudice", "under protest" or the like are sufficient.

interest and the dates of each installment payment.

Moreover, not only did Komarow intend that this be in full satisfaction of all claims, Lande clearly understood it as such. He never told Komarow that, as he now claims, he considered it as only part payment of something more he should receive. When he received the letter, schedule and check in February, he did not understand why the total due was indicated to be $52,000 rather than $60,000, so he called Komarow to ask. Komarow explained to him that the $8,000 deduction represented Lande's long-outstanding loan of $8,716 from the Equipment Company. Apparently Lande did not take issue with the explanation. Rather, he simply accepted and negotiated the check and all the subsequent ones.[9] Lande also told Komarow in their phone conversation that he thought the interest rate should be 10% instead of 7.5%, but when Komarow said no, Lande "couldn't argue very much."

Apart from the operation of law by which Lande's conduct establishes the formation of an accord and satisfaction, as a factual matter I believe Lande knowingly did accept the offer evidenced. While he no doubt would have liked to receive more than the $52,000, at some point, either by February or shortly thereafter, he assented in his own mind. If not, his conduct was inexplicable. The evidence shows that he acted with the assistance of his accountant and his attorney, and he had been given all financial records and all information he or they requested from the defendants. Not even *once*, at any time subsequent to the meeting in November 1987, did he raise the issue of the $60,000 amount. Even in Octo-

ber 1988, when he told the defendants he would not sign the formal written agreement, his express reason had to do with future speculative tax liability. Surely, if the status of events when he left the November 1987 meeting were that he was going to consider the $60,000 offer, one would expect that he would have requested another meeting or proposed a counteroffer or sought to discuss the amount with Komarow at some time thereafter. The only explanation for his failure to do so is that he came to peace with it.[10]

Plaintiff argues that the agreement would be barred by New York General Obligation Law § 5–701(a)(1) (McKinney 1989) and Uniform Commercial Code § 8–319(a) (McKinney 1990). The first is New York's general statute of frauds which requires for enforcement of the agreement found herein (because it was one not to be performed within one year) that "it or some note or memorandum thereof" be in a writing subscribed by plaintiff. The second, UCC § 8–319(a), is the more specific statute of frauds applicable herein, involving a sale of securities, and provides as follows:

> A contract for the sale of securities is not enforceable by way of action or defense unless
>
> (a) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price. . . .

The chief difference between this provision and the more general statute of frauds is

---

**9.** Although he now contends in his post-trial brief that he did not know about this loan in November and that it was not discussed at the meeting, the evidence is conclusive that it was set forth in the documents he and Sutherland, his accountant, analyzed and that Sutherland clearly understood from the meeting that the $60,000 was to be reduced by the amount of the loan. Indeed, Sutherland's notes from the meeting include the following:

Due from Stockholder  –  Lande 8716
Settlement        60,000
                   8,716
                  51,284    ÷   24    $2137
  D.Ex. 7.

**10.** Although Lande's reason for changing his mind at some point and attempting to back out of the deal is irrelevant, it may be noted that defendants theorize that the real cause was that Lande learned that Ryon, who left the practice after Lande (apparently in March 1988), had obtained a deal for a considerably larger payout. Lande testified that he "heard rumors" that Ryon received $86,500. Tr. 90. Komarow testified that Ryon's salary had always been higher than the other doctors' because he had opted not to participate in their Keogh plan.

that the agreement must contain reference to the quantity of securities and price thereof.

■ Plaintiff's contention that the agreement is void because not in writing is without merit. It is black-letter law that an agreement satisfying the statute of frauds may be evidenced by piecing together various writings of which only one need be signed by the party against whom enforcement is sought so long as it is referable to the same transaction as the other documents. The New York Court of Appeals' language in *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 110 N.E.2d 551 (1953), is the classic statement of the New York rule:

> All of [the terms] must be set out in the various writings presented to the court, and at least one writing, the one establishing a contractual relationship between the parties, must bear the signature of the party to be charged, while the unsigned document must on its face refer to the same transaction as that set forth in the one that was signed.

305 N.Y. at 55–56, 110 N.E.2d at 554. More recently, in *Henry L. Fox Co., Inc. v. William Kaufman Organization, Ltd.*, 74 N.Y.2d 136, 544 N.Y.S.2d 565, 542 N.E.2d 1082 (1989), the Court of Appeals explained as follows:

> The purpose of Statutes of Frauds is to avoid fraud by preventing the enforcement of contracts that were never in fact made. Generally the statute is satisfied by some note or memorandum signed by the party to be charged that is adequate to establish an agreement when considered in light of the admitted facts and surrounding circumstances. Given proof of agreement by such evidence, its particular terms may be furnished by piecing together other, related writings.

544 N.Y.S.2d at 567, 542 N.E.2d at 1084. *See also Restatement of the Law: Contracts 2d* § 132 (memorandum satisfying statute of frauds "may consist of several writings if one of the writings is signed and the writings in the circumstances clearly indicate that they relate to the same transaction").

■ Plaintiff's endorsement and deposit of the February 1988 check, in conjunction with Komarow's explicit letter and payment schedule (D. Ex. 3), was sufficient to satisfy the statute of frauds. This first check was annotated "Stock Repurchase" and its amount, $2,108.33, matched to the penny the amount due that month according to the complete schedule enclosed. The subsequent checks were also endorsed and negotiated by plaintiff, with their various annotations and references to the remaining balance, and were also clearly referable to Defendants' Exhibit 3. They, and the additional correspondence from Komarow (D. Exs. 4 and 6) only add to the already sufficient body of writings, which are connected both expressly and "by the internal evidence of subject-matter and occasion." *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. at 54, 110 N.E.2d at 553. *See, e.g., Marcella v. ARP Films, Inc.*, 778 F.2d 112, 116 (2d Cir.1985); *Great Destinations, Inc. v. Transportes Aeros Portugueses S.A.R.L.*, 460 F.Supp. 1160, 1163 (S.D.N.Y. 1978); *Pollack v. Nemet Motors, Inc.*, 167 A.D.2d 153, 561 N.Y.S.2d 457 (1st Dep't 1990); *Aloisi v. Coin Phones, Inc.*, 157 A.D.2d 688, 549 N.Y.S.2d 787 (2d Dep't 1990) (in specific reference to UCC § 8–319); *Kardis v. Lennon*, 135 A.D.2d 613, 522 N.Y.S.2d 191 (2d Dep't 1987). As discussed above, these writings show all the essential terms of the contract: plaintiff would receive, in full satisfaction of all monies owed to him by the practice, $52,000 plus 7.5% interest through 24 monthly payments. The amount of principal, the amount of interest and the date to be paid were shown for each.[11]

---

11. Plaintiff's contention that the requirements of UCC § 8–319 have not been met because there is no writing signed by plaintiff that specifies share quantity and price per share is without merit. The statute requires simply that the quantity of securities and a defined or stated price be indicated among the various writings evidencing the contract. Clearly, here, the documents show defendants were buying back all of plaintiff's shares in the corporation for the specified amount.

Similarly without merit is plaintiff's contention that the writings are insufficient to satisfy the statutes of frauds because certain essential

Plaintiff's citation to *Pettigrew v. Denwalt*, 431 P.2d 333 (Okla.1967), apparently the only case to support him that he finds "closely analogous" to the facts here, is misplaced. In that case the Oklahoma court found that four checks endorsed by the plaintiffs were insufficient to satisfy the statute of frauds to create a five-year lease agreement on two properties rather than a one-year lease because the only check endorsed by the plaintiff who was the sole owner of one of the properties allegedly leased was annotated to refer only to a one-year lease for one specific year. The other checks had been endorsed only by that plaintiff's husband, who was joint owner with her of the second property, in which they resided. In rejecting the defendant's claim of a leasehold as to this property, the court moreover relied on an Oklahoma statute that provided that no lease could be created on a homestead without a writing signed by both a husband and wife. Rather than support for plaintiff's position herein, a search of other jurisdictions reveals that, to the contrary, in cases analogous to this one, the courts have uniformly found endorsement and negotiation of checks referable to the claimed transaction adequate to satisfy the statutes of frauds in circumstances even less compelling. *See, e.g., Jones v. Olsen,* 80 Ill. App.3d 1016, 36 Ill.Dec. 245, 400 N.E.2d 665 (1980); *Favour v. Joseff,* 16 Ariz.App. 470, 494 P.2d 370 (1972); *Jinright v. Russell,* 123 Ga.App. 706, 182 S.E.2d 328 (1971).

## CONCLUSION

As indicated, Lande reached an accord and satisfaction with the defendants as reflected in Defendants' Exhibit 3. The total shown therein of $55,300 was in full satisfaction of all claims Lande has made in this

---

terms are not included. The question of "what is an essential term for purposes of the Statute of Frauds is a flexible concept that depends upon whether that term seriously affects the rights and obligations of the parties, and whether there is a significant evidentiary dispute as to whether the parties agreed on that term." *City of Yonkers v. Otis Elevator Co.,* 649 F.Supp. 716, 730 (S.D.N.Y.1986), *aff'd,* 844 F.2d 42 (2d Cir. 1988). Plaintiff confuses the possibility of what might have been included in a contract with what actually formed the essential terms of the contract the parties reached. The requirement of the statute of frauds that the writings contain the essential terms of a contract is based on the purpose of the statute, *viz.,* to assure the court that a valid agreement was made, rather than to supply every aspect of that agreement or items that could have been included by the parties but were not. See 2 *Corbin on Contracts* § 499 (1950). Thus, plaintiff's chief example of an allegedly material term that is not addressed in the documents is plaintiff's liability in the event the IRS were to do an audit of the period during which he was a shareholder and find taxes due. However, for whatever reason plaintiff began to be concerned with such an eventuality some time in mid–1988, long after his entering into the agreement, there is no evidence that it was a concern or that it was discussed or even raised by plaintiff prior to then. Moreover, such an item is hardly essential to this contract which is quite complete and understandable without it. *See, e.g., Corbin on Contracts, supra,* at p. 689 ("If a memorandum for the sale of land describes the land, the price and the parties, it satisfies the statute if the parties made an oral agreement containing only those terms, intend-ing to be bound thereby, saying nothing whatever as to the form of deed, the time and place of payment and delivery, what shall be done with respect to taxes and existing incumbrances") and cases cited therein, including *Nuzum v. Spriggs,* 357 Pa. 531, 55 A.2d 402 (1947) (broker's memorandum, acknowledging receipt of $300 and stating "balance of $9700 payable upon delivery of a good and sufficient deed on or before November 1, 1945," held sufficient: "It is unnecessary to discuss in detail such terms as pro-rating of taxes, rents, issues and profits, the nature of title to be obtained, form of warranty or delivery of possession. It is sufficient that the memorandum provided for a good and sufficient deed.") *See also Birnhak v. Vaccaro,* 47 A.D.2d 915, 367 N.Y.S.2d 792, 794–95 (2d Dep't 1975); *Farr v. Newman,* 18 A.D.2d 54, 238 N.Y.S.2d 204, 209 (4th Dep't 1963), *aff'd,* 14 N.Y.2d 183, 250 N.Y.S.2d 272, 199 N.E.2d 369 (1964). Plaintiff's contention, if correct, would lead to absurd results. If the parties had to include what responsibility plaintiff would have in the event the IRS should do an audit and in the event taxes were found due, they presumably would have had to include terms for all sorts of other contingencies normally dealt with by the operation of law, such as plaintiff's and defendants' respective potential liabilities if a former patient sued for malpractice pertaining to the time plaintiff was a shareholder or if the government found the radiology equipment had not been properly maintained or if, sometime before plaintiff's payout were completed, the practice were destroyed by fire. The list could, of course, go on and on. By plaintiff's reckoning, "essential" terms would almost always be missing from all agreements.

action.[12] The parties are to submit a proposed judgment in accordance with this opinion within ten days hereof that will include the manner payment will take of the balance due to plaintiff. If agreement on the form of judgment cannot be reached, the court is to be contacted prior to the expiration of the ten-day period.

---

12. Lande's claims of entitlement to additional compensation for 1986 and 1987 and for vacation and educational leave have not been separately discussed herein because they, too, are barred by the agreement which, as his stock repurchase, was clearly intended to be the final chapter to all financial claims Lande had against the corporation and to close its mone- tary responsibilities to him. These specific claims were never raised by Lande at any time prior to this action. I might add, in any event, that even if we did not have an agreement barring recovery for the designated "additional" amounts, plaintiff has not carried his burden of establishing that he would have been entitled to them as a financial matter.